WILLIAM H. HOLLISTER, Appellant and Respondent, *v.* JOHN A. STEWART et al., Appellants and Respondents.

The trustees named in a railroad mortgage have no right, as against and without the consent of the holder of bonds secured by the mortgage, and in the absence of provisions therein authorizing it, to waive and condone defaults in the payment of principal or interest on his bonds or to assent to and recognize a new mortgage given priority over his.

The W. C. R. R. Co., for the purpose of obtaining means with which to construct its road, issued bonds secured by a mortgage covering its line, rolling-stock and other property, including a land grant given it by the United States government. By the mortgage it was made the duty of the trustees named therein in case of default in any payment of principal or interest on the bonds to apply the mortgaged property "promptly to that purpose." The company, with the approval of the trustees, was authorized to sell the lands covered by the land grant, accept the mortgage bonds in payment or hold the proceeds of sales as a sinking fund for payment of the bonds. Interest on the bonds was to be paid by the company, and it was provided that none of such proceeds were to be appropriated to the payment of interest unless the treasury of the company should be first exhausted, in which case the proceeds might be used to pay accrued interest, the company to execute to the trustees "income bonds" therefor, to be first paid out of the earnings of the road and secured by a second mortgage. In case of default in the payment of interest on the first mortgage bonds, the whole principal became due at the option of the trustees, and they were authorized to enter

upon the granted lands, to take possession of the railroad and rolling-stock and to sell the whole property and apply the net proceeds ratably to the payment of unpaid bonds and interest. By article thirteen of the mortgage the company was required, in case of such default, to execute such further deeds and assurances as were needed and to furnish a full inventory, etc. By a subsequent article the trustees were required, on the requisition of the holders of not less than one-fourth of the bonds, to exercise their power of entry, or sale or both. If a default was made in the omission of anything required by said article " for the further assuring of the title of the trustees, * * * or in any provisions herein contained to be performed or kept by said company " the trustees were given a discretion " to enforce or waive the rights of the bondholders by reason of such default," subject to a power in a majority in amount of the bondholders to instruct the said trustees to waive such default, but it was declared that no action of the said trustees or bondholders, or both, in waiving such default, should extend to or be taken to affect any subsequent default. *Held,* that the trustees had no discretion to waive a default in the payment of principal or interest; that the words " or in any provisions," etc., were to be construed to relate to the provisions other than those already specifically provided for.

The corporation entered into a contract for constructing its road, by which it agreed that the contractors should receive in payment for the construction the whole issue of first mortgage bonds, all of the stock and the earnings of the road during the period of construction. The contractors were to procure the necessary funds by sale of these securities and were to buy up the interest coupons as they matured. The contractors proceeded with the work, sold bonds and took up maturing coupons, but while the road was incomplete, not having funds to meet interest amounting to over $150,000 about to mature, by an arrangement between the company, the contractors and the trustees, proceeds of the land grant sales to the amount of the coupons so taken up were assigned by the trustees, they taking from the company as security an "income bond " conditioned to pay the amount, with interest, out of the earnings of the road. The company or the contractors then borrowed the money to take up maturing interest coupons, the company giving as security " land income notes " with the sinking fund securities, which were so assigned, pledged as collateral. To procure money to complete the road the company increased its land income notes to $300,000. Another default in interest having occurred, the trustees began a foreclosure suit, and under authority of the mortgage, took possession of the road and began to operate it, and thereafter joined with a majority of the bondholders in and adopted a plan for reorganization. This contemplated the substitution of three mortgages for the first mortgage, one of these for $400,000, which, with the accompanying bonds, was given to secure the land income notes, and interest on certain unfunded coupons; this was made a first lien

on all of the property of the company. The trustees assumed to waive all previous or future defaults in payments of principal or interest on the first mortgage bonds; they thereafter applied some part of the proceeds of the land fund to payments of principal and interest on the new preferred mortgage bonds. In an action brought by plaintiff, who held bonds secured by the first mortgage and who had not assented to the reorganization scheme or to the waiver of defaults, against said trustees, a judgment was rendered compelling them to pay the proceeds of the land sales in ratable proportions upon plaintiff's bonds and adjudging the new mortgages to be void as to him. *Held,* no error; that the scheme of reorganization could only be made effective by consent of all the original bondholders or by a foreclosure cutting off their lien; that plaintiff had a right to stand upon his contract and the trustees had no power to compel him to make a new and different one.

*C. S. R. Co.* v. *Gebhard* (109 U. S. 527) distinguished.

By the fourth article of the mortgage, securing the bonds, it was provided that "during the construction of the said railroad hereby mortgaged, the interest on the bonds * * * shall be paid out of the earnings of the said road and the proceeds of sales of the first mortgage bonds," and as by their contract the contractors were to receive in payment for construction the whole issue of first mortgage bonds, and the earnings of the road during construction; *held,* that the coupons taken up by them were extinguished as obligations and could not form the basis of a claim by them against the company. (GRAY, J.; DANFORTH and PECKHAM, JJ., concurring.)

The first mortgage contained a provision that neither of the trustees "shall be answerable except for his own willful default or neglect." The trial court found that defendants, although acting erroneously, proceeded in good faith. Plaintiff claimed that the bonds of those who assented to the reorganization should be considered as extinguished, and that all the proceeds of the land grant and income from earnings should be devoted to the payment of bonds held by the non-assenting owners. *Held,* that the omission to pay plaintiff had some excuse in his exorbitant claims, and that judgment was properly rendered against the trustees, as such, and not personally.

Also, *held,* that the holders of the new preferred bonds were not necessary parties; that the trustees and the company are all the parties necessary.

The defense of a former suit pending, to be available, must be pleaded.

(Argued January 23, 1888; decided January 15, 1889.)

CROSS APPEALS from judgment of the General Term of the Supreme Court in the first judicial department, entered upon an order made November 19, 1885, which modified, and affirmed as modified, a judgment in favor of plaintiff entered

upon the report of a referee; also appeal by defendants from so much of said order as affirmed an order of Special Term denying a motion on the part of defendants to resettle the judgment.

This action was brought by plaintiff, as owner of certain bonds issued by defendant, the Wisconsin Central Railroad Company, secured by mortgage on all its property against the company and the trustees named in said mortgage, to restrain said trustees from taking certain proceedings which the complaint alleged they were about to take, which were in violation of their duty and plaintiff's rights, and for other equitable relief.

The facts, so far as material, are stated in the opinion.

*Wheeler H. Peckham* for plaintiff. The General Term erred in modifying the judgment by relieving the trustees from personal liability. When a trustee disposes of money in an unauthorized manner, he must replace it, and is personally liable. (*Atty.-Gen.* v. *Wilson*, 1 C. & P. 1–21; *Atty.-Gen.* v. *Dublin*, 1 Bligh. [N. S.] 312; *Atty.-Gen.* v. *Belfast*, 4 Irish Ch. 142–144; Perry on Trusts, §§ 927, 461, 761, 847; *Ackerman* v. *Emot*, 4 Barb. 626–645.) The General Term erred in reversing, and the referee was right in directing defendants to go on with the foreclosure suit of the first-mortgage in Wisconsin. (Perry on Trusts, § 760; *In re Mechanics' Bk.*, 2 Barb. 446.) This court has jurisdiction of all trusts and of all trustees when it can get jurisdiction of their persons; and the rule in such case is the same as in other personal actions. Any number of suits may go on in different jurisdictions, but the first judgment obtained is conclusive, and may be given in evidence with conclusive effect in the other suits. (*Williams* v. *Ayrault*, 31 Barb. 364, 367, 368; *Trubee* v. *Alden*, 6 Hun, 78; *Osgood* v. *Maguire*, 61 Barb. 59; *Lorillard Co.* v. *Meshural*, 7 Robt. 309, 314; *Union Trust Co.* v. *Olmstead*, 102 N. Y. 729.)

*D. S. Wegg* for defendants. In a court of equity the indebtedness represented by the preferred bonds is of such a

character as to entitle it to payment prior to complainant's claims. (*Jerome* v. *McCartee*, 94 U. S. 734; *Kennedy* v. *S. P. P. R. R. Co.*, 2 Dillon, 448; *Hoover* v. *M., etc., R. R. Co.*, 29 N. J. Eq. 4; *Stanton* v. *A., etc., R. R. Co.*, 2 Woods, 506; *Meyer* v. *Johnston*, 53 Ala. 237; *Coe* v. *N. J. M. R. Co.*, 27 N. J. Eq. 37; *In re U. S. R. S. Co.*, 55 How. Pr. 286; *Pierce* v. *Emery*, 32 N. H. 484–521.) The bonds and coupons in suit are non-negotiable, and all equities attaching to them in the hands of a prior owner bind the present holder. (*Little* v. *Phœnix Bk.*, 2 Hill, 425; 7 id. 357; *Pardee* v. *Fish*, 60 id. 265; *Lindsey* v. *McClelland*, 18 Wis. 481; *Freeman's Bk.* v. *Ruckman*, 16 Grat. 126; *Parsons* v. *Jackson*, 99 U. S. 434.) The preferred bonds should be first paid, as the mere change in form of the evidence of indebtedness did not, and could not, change its character or its rights to precedence over complainants' claim. (*Dunham* v. *Dey*, 15 Johns. 355; *Brinckerhoff* v. *Lansing*, 4 id. 64; *Watkins* v. *Hill*, 8 Pick. 522; *Davis* v. *Maynard*, 9 Mass. 242; *Pomeroy* v. *Rice*, 16 Pick. 22; *Chase* v. *Abbott*, 20 Iowa, 154; *Iowa* v. *Lake*, 17 id. 215; *Stevens* v. *M. H. R. R. Co.*, L. R., 8 Ch. Ap. 1064.) No preference should be allowed the plaintiff, and the complaint should be dismissed. *In re G. W. (Forest of Dean) C. Co.*, 21 L. R., Ch. Div. 769. *In re C. H. C. Co.*, L. R. Ch. Div. 259; *In re D. C. F. E. & T. Co. (Limited), Canada*, 55 Ch. Div., L. T. Rep. [N. S.] 347; *Ames* v. *N. O. M. & T. R. R. Co.*, 2 Wood, 206.) Henry F. Spencer, trustee of the land income notes, was and is a necessary party to this litigation. (*Green* v. *Sisson*, 2 Curtis, 171; Perry on Trusts, § 881.) Under the terms of the trust deed the will of the majority must rule, and a disaffected two and one-half per cent cannot be heard to complain. (*In re C. R. Co.'s Scheme*, L. R., 3 Ch. App. 278; *C. S. R. Co.* v. *Gebhard*, 109 U. S. 527.) The court in this case should construe plaintiff's acceptance of benefits earned by the plan of reorganization as an implied assent to the plan, and should also hold him bound by the acts of the trustees under the very large discretionary powers vested in such

trustees by the trust deed of 1871. (*Gilfillan* v. *U. C. Co.*, 109 U. S. 401; *Gates* v. *B.*, etc., *R. R. Co.*, 1 The Reporter, 464; *Shaw* v. *R. R. Co.*, 100 U. S. 611; *Sturges* v. *Knapp*, 31 Vt. 57.) The parties who advanced moneys to save the trust estate, and whose equities are represented by preferred bonds, are entitled to a priority of payment. (*Noyes* v. *Blakeman*, 6 N. Y. 567; *Randall* v. *Dusenbury*, 39 N. Y. Super. Ct. 174; 63 N. Y. 645; *Stanton* v. *King*, 8 Hun, 4; *New* v. *Nicoll*, 73 N. Y. 127; *Perry* v. *Bd. of Missions*, 102 id. 99; *Burroughs* v. *Gaither*, 66 Md. 171; *U. T. Co.* v. *I. M. Co.*, 117 U. S. 434; *Jerome* v. *McCartee*, 94 id. 734.) The judgment should be reversed for want of necessary parties. (Culvert on Parties, 4, 13; Story's Eq. Pl. §§ 72, 75, 207; *Holland* v. *Baker*, 3 Hare, 68; *Hughès* v. *Eades*, 1 id. 486; *Gray* v. *Schenck*, 4 N. Y. 460; *Peafold* v. *Nunn*, 5 Sim. 405; *Weatherby* v. *St. Giorgio*, 2 Hare, 624; *Newton* v. *Egmont*, 5 Sim. 130; *Milligan* v. *Mitchell*, 1 M. & C. 433; 1 Daniel's Ch. Pr. 287; *Hoe* v. *Wilson*, 9 Wall. 501; *Hickock* v. *Scribner*, 3 Johns. Cas. 311; *Coiron* v. *Millandon*, 19 How. [U. S.] 113, 115; *Hill* v. *Proctor*, 10 W. Va. 59, 78; *Shaver* v. *Brainard*, 29 Barb. 27; *Davis* v. *Mayor*, etc., 2 Duer, 633; *S. C.*, 14 N. Y. 521; *Penn* v. *Hayward*, 14 Ohio St. 302, 306; *Sherman* v. *Parish*, 53 id. 483, 490; *Osterhoudt* v. *Taxpayers*, 98 id. 239; *Richards* v. *Richards*, 9 Gray, 313, 315; *Greenwood* v. *Atkinson*, 5 Sim. 419; *Holland* v. *Baker*, 3 Hare, 68; *Jesse* v. *Bennett*, 6 DeG., M. & G. 609; *Williams* v. *Allen*, 29 Beav. 292; *Camp* v. *McGillicudy*, 10 Iowa, 201; *Forepaugh* v. *Appold*, 17 B. Mon. 625; *Sturtevant* v. *Brewer*, 17 How. Pr. 571; *Phillipson* v. *Gatty*, 6 Hare, 26; 9 Abb. Pr. 414; *Perry* v. *Knott*, 4 Beav. 179; *Minn.* v. *Staut*, 15 id. 49; *Carlisle* v. *R. R. Co.*, 1 Mac N. & G. 689, 698; *Cassidy* v. *Shimmin*, 122 Mass. 406, 411; *Hubbard* v. *Eames*, 22 Barb. 597, 602, 605; *Williamson* v. *Field*, 2 Saw. Ch. 533, 562; *Read* v. *Prest.*, 1 Kay & Johns. 183; *Payne* v. *Parker*, L. R., 1 Ch. App. 327; *Hammond* v. *Walker*, 3 Jur. [N. S.] 686; *Browne*

v. *Blount,* 2 R. & My. 83 ; *Chipman* v. *Montgomery,* 63 N. Y. 221, 232 ; *Stevens* v. *M. H. R. R. Co.,* L. R., 8 Ch. App. 1069.)

*William A. W. Stewart* for defendants. The injunction restraining the defendant trustees from making payments on the preferred bonds should be vacated, the plaintiff being in the wrong forum to obtain such relief. (*Stern* v. *W. C. R. R. Co.,* 1 Fed. Rep. 555 ; *Owens* v. *O. C. R. R. Co.,* 20 id. 10 ; *U. T. Co.* v. *R. R. R. Co.,* 6 Biss. 197 ; *Buck* v. *Colbath,* 3 Wall. 341 ; *Riggs* v. *Johnson Co.,* 6 id. 166 ; *Levy* v. *Col. L. Ins. Co.,* 1 Fed. Rep. 206.) Plaintiff is equitably entitled to just as much income and security as he would have received had the reorganization plan never been devised, and the preferred bonds, to the issuance of which he did not assent, had never been issued, and he is further entitled, *pro rata* with all other bonds secured by the first mortgage, to the profits and benefits of the property in the possession and management of the trustees. (*Ketchum* v. *Duncan,* 96 U. S. 659 ; *Stevens* v. *N. Y. & O. M. R. R. Co.,* 13 Blatchf. 412 ; *Virginia* v. *C. & O. C. Co.,* 32 Md. 501 ; *Perry* v. *Bd. of Missions,* 102 N. Y. 99.) The proof and judgment must conform to the complaint in a suit in equity as well as in an action at law. (*Stevens* v. *Mayor, etc.,* 84 N. Y. 296 ; *Southwick* v. *First Nat. Bk.,* 84 id. 420 ; *Wintermute* v. *Cook,* 73 id. 107.) If plaintiff really wishes foreclosure, let him apply for leave to intervene in the action pending in the United States Circuit Court, and if he can satisfy that court that the trustees have improperly refused to adopt the policy of foreclosure, he can obtain a judgment of foreclosure and sale. (*Alexander* v. *C. R. R. Co.,* 3 Dillon, 487 ; Jones on R. R. Securities, § 436.)

FINCH, J. On the first argument of this case I read the following opinion, omitting only a portion of the argument as to jurisdiction, which I deem it unnecessary to repeat. Upon the reargument I am contented to stand upon it, and hand it down now as the ground of my vote for affirmance. That opinion was as follows :

The action of the trustees to whom the first mortgage of the

Wisconsin Central Railroad Company was given, and who by that instrument were charged with certain duties, and intrusted with important powers for the benefit and protection of the bondholders secured by its lien, has been adjudged not in accordance with the trust, although not a willful departure therefrom, and they have been required to furnish indemnity for the past and properly perform the trusts in the future.

Both sides appeal; the trustees upon the ground that they have in no just sense or respect violated their duty, but have acted in all things within their powers and wisely for the interest of those whom they were bound to protect, and the plaintiff, who holds bonds secured by the mortgage to the amount of two hundred thousand dollars, because the General Term modified the judgment by relieving the trustees from personal liability, and from the command to prosecute the foreclosure of the mortgage, already commenced, to an ultimate sale and distribution. To obtain a safe foundation for our judgment, it thus becomes necessary to examine fully the provisions of the mortgage, since the authority of the trustees has no other source, and their duty no other measure.

That mortgage, given for something over eight millions of dollars, was executed by the company substantially for the purpose of obtaining the means with which to construct its road. The security covered not only the line with its rolling stock and stations and other and usual property, but also a valuable land grant, given by the general government to aid in the completion of the enterprise, and conditioned upon its progress toward that completion. All this property, by article second of the mortgage, is pledged to the payment of the interest and principal of the bonds, and it is made the duty of the trustees to apply the same "promptly to that purpose," " in case of default in any such payment" by the mortgagor.

But this incumbrance, covering the land grant earned by the corporation, and intended to be utilized by sales as purchasers could be obtained, involved the necessity of an authority in the trustees to release the lands from the lien when the sales were effected. Accordingly, article third authorized the

corporation, with the approval of the trustees, to contract for the sale of such lands for cash or on credit, and accept any of the bonds with their matured coupons at par in payment; but required that all the proceeds of every such sale, "whether in cash, bonds, coupons or other securities," should be deposited with the trustees, and proper releases be given by them to the purchasers. The proceeds of the lands thus became substituted for the lands themselves, and continued subject to the mortgage lien. Out of these proceeds a sinking fund was established for the payment and redemption of the bonds. The trustees were directed to invest such proceeds in the first mortgage bonds of the company whenever they could be purchased at not exceeding par and accrued interest, but the trustees were not to hold the bonds and coupons which thus came into their hands as living obligations against the company, for, whether obtained by purchase with the proceeds of sales, or taken as cash in payment for the lands, the trustees were required to cancel them every three months and surrender them to the company as paid. In other words, the authority was to pay the bonds out of proceeds, but not to buy and hold them against the obligors, or mortgage such proceeds for other purposes. As to any proceeds which could not be so appropriated because bonds could not be obtained at par, further provisions were made for their investment, specifying the classes of securities, and reserving some choice and discretion in that respect to the company.

By article fourth additional strength and protection was given to the sinking fund through a provision relieving it from the payment of interest on the bonds during the progress of construction except in one emergency. That interest was to be paid by the company, and none of the land proceeds were at any time to "be appropriated to the payment of interest on said bonds" unless the treasury of the company should be first exhausted. In that event the sinking fund was permitted to pay accrued interest; not, as we have said, to buy or secure coupons, but to pay and discharge them — and since in so doing the land fund would be bearing the burden

contracted to be borne by the company, such reimbursement as seemed reasonably possible was ordered to be made. For all such payments of interest made out of the sinking fund in the prescribed emergency the company was to give to the trustees income bonds to be first paid out of earnings before any dividend to stockholders. These bonds were to draw interest at seven per cent, and were to " be redeemed by other bonds of the company bearing the same rate of interest in gold and secured by a second mortgage " if the company should determine to issue such bonds.

The mortgage then regulated the duties of the trustees in case of default. If such default in the payment of interest continued for six months, the whole principal became due at the option of the trustees, and they were authorized to enter upon and sell the granted lands at public auction; to enter upon and take possession of the railroad and its rolling stock; to operate and manage the line and apply any surplus over expenses and necessary repairs and improvements to the payment of interest upon the first mortgage bonds " in the order in which such interest shall have become or shall become due, ratably to the persons entitled to such interest;" but if the default should continue for a year, then the trustees were authorized to sell the whole of the property, or so much as might be necessary, and apply the net proceeds " to the payment of the principal of such of the aforesaid bonds as may be at that time unpaid, whether or not the same shall have previously come due, and of the interest which shall at that time have accrued on the said principal and be unpaid without discrimination or preference, but ratably to the aggregate amount of such unpaid principal and accrued and unpaid interest."

Article 13 required the company to execute such further deeds and assurances as might be needed, and to furnish a full inventory of all the movable property of the company.

Article 16, about which there is serious dispute over its scope and meaning, deals again with the emergency of a default, and makes it the duty of the trustees to exercise their

power of entry or power of sale, or both, or take appropriate legal proceedings to enforce the mortgage in manner following : If the default is in the payment of interest or principal of the bonds, then, upon the requisition of the "holder of not less than twenty-five per cent of the aggregate amount of said bonds," accompanied by a proper indemnification by the persons making the same against the costs and expenses to be incurred ; but, the instrument proceeds, "if the default be in the omission of any act or thing required by article 12 of these presents for the further assuring of the title of the trustees to any property or franchises now possessed or hereafter acquired, or in any provisions herein contained to be performed or kept by said company, then, and in either of such cases, the requisitions shall be as aforesaid ; but it shall be within the discretion of the trustees to enforce or waive the rights of the bondholders by reason of such default, subject to the power hereby declared of a majority in interest of the holders of said bonds, by requisition in writing or by a vote at a meeting duly held, to instruct the said trustees to waive such default, or to enforce their rights by reason thereof, provided that no action of the said trustees or bondholders, or both, in waiving such default or otherwise shall extend to or be taken to *effect* any subsequent default, or to impair the rights resulting therefrom." It is substantially conceded, as, indeed, is quite apparent, that the word " effect " should be read " affect," and that the reference to article 12 should be to article 13, which contains the provisions for further assurance which are referred to, and which identify the article intended.

It is now said, on behalf of the trustees, that this provision gave them a discretion to waive a default in the payment of interest or principal of the bonds, subject only to be controlled by the requisition or vote of a majority in interest of the bondholders. We do not accede to that construction. Provision had just been made, in a preceding paragraph, for the emergency of a default in principal or interest, which imposed the duty of proceeding upon the default on the requisition of twenty-five per cent in interest of the bondholders. That

gives no discretion to the trustees, but imposes an imperative duty. The following subdivision, entirely different in its terms, relates to another and distinct default, less serious in its consequences, and not of such vital importance, as to which a discretion was given which might be controlled by a majority in interest. By its very language it relates to a default in the covenants for further assurance in article 13 ; and its added words, " or in any provisions herein contained to be performed or kept by said company," although very general and broad, must be construed to relate to the provisions other than those already provided for by different and more stringent directions. It is easy to see that discretion to waive a default, sustained by a majority in interest of the bondholders, might prudently and safely be given to the trustees as to covenants for assurance and to furnish an inventory and the like, while it is scarcely possible to suppose that the enormous discretion of waiving every default of interest or principal was intended to be conferred. Stockholders of the company buying a trifling excess over half of the bonds could, with the aid of the trustees, practically annul and cancel the whole debt, and take to themselves the entire net earnings of the company. We are confident that the language of the subdivision, taken exactly as it stands in the record, does not refer to a default in principal or interest, but relates wholly to the other covenants to be kept and performed by the mortgagor.

The mortgage contained a further provision, important to be considered in reaching a determination of the appeal, that neither of the trustees " shall be answerable except for his own willful default or misconduct."

Having thus ascertained the authority and duty of the trustees, it becomes necessary to get as clear and definite a view of what they did as can be gathered from the record. And this can only be done by taking also into view the precedent and concurrent action of the railroad corporation itself.

The mortgage was executed on the 1st day of July, 1871. The company seems at once to have abdicated all its functions beyond merely retaining its corporate existence, for it agreed

with contractors, who engaged to build the road, to give them the whole issue of bonds not exceeding $25,000 a mile, which was the maximum limit of issue, and the whole of the stock and all the earnings of the road during the period of the construction, as a consideration for such construction. The contractors were to procure the necessary money by sale of these securities, and were to advance funds and buy up the coupons as they matured and possibly retain them as against the company.

They proceeded with their work; they sold the bonds and bought the maturing coupons, and continued this process until their debt, represented by such coupons, amounted to something more than half a million of dollars. Parallel with this accumulating debt the land fund in the hands of the trustees was being filled by the sales of lands, the proceeds of which, in the form of cash, contracts, mortgages and the like, reached what is called a large sum, but which the record does not disclose.

In this condition of affairs, and while the road was incomplete, and in December, 1874, it became apparent that the contractors were about to fail of performance, and could not continue to furnish funds for the purchase of coupons. Interest amounting to something over $150,000 was about to mature, and the company's treasury was exhausted. Indeed, there had never been either treasury or treasure. To meet this emergency the land fund was the sole resource, and was called upon, as by the terms of the mortgage was permitted. What then occurred is involved in so much of confusion and uncertainty from want of details that, to avoid mistakes, we take the facts from defendants' brief. It declares that "the contractors, prior to January 1, 1875, had bought up and held as unpaid as against the company $534,869.25 of coupons. To induce and enable the contractors to buy up the coupons maturing January 1, 1875, the land proceeds to the amount of $534,869.25 were assigned and *paid* to the contractors." If that be true, the over-due coupons were paid and extinguished and the transfer canceled the debt. So far there is no hint that the assignment was collateral, and the trustees got no power

from the mortgage to do anything but pay. Yet the brief of the learned counsel adds, "and then all the land proceeds and over-due coupons were delivered by the contractors over to Henry F. Spencer, trustee, as collateral for the sums advanced for January, 1875, interest." That would seem to indicate that the coupons were not paid and the assignment was collateral. This is confirmed by the testimony of Mr. Abbot, who, when speaking of the over-due coupons held by the contractors, said, the assignment to Spencer was "for the *gradual* redemption and payment of *these* over-due coupons," and adds, "the whole mass of the over-due coupons and of these proceeds of land sales was then declared by Spencer, trustee, to be held by him as collateral security for the sums of money advanced in the purchase of the January 1, 1875, coupons." If that be true, the contractors' coupons were not paid. They were simply secured, and the debt and its collateral were used to procure a loan with which not to pay, but to buy, the maturing interest coupons. The transfer by the trustees was probably, in substance, an advance to the railroad company, which may have transferred it to the contractors, who pledged it to Henry F. Spencer, as trustee, and, with the proceeds, bought the maturing coupons. In the whole process we fail to see that any interest was actually paid. The mortgage trustees took back from the company as security for the advance what is called an income bond. That instrument was drawn in a penalty of one million of dollars, and was conditioned to pay back the advance on or before the 1st day of January, 1901, with interest at seven per cent out of the earnings of the road; to pay the accrued interest on such advances after the completion of the road from the net income remaining after payment of interest on the first mortgage bonds; and to give a second mortgage for the debt if it should so determine. The company, of the contractors, then borrowed the sum needed to buy or pay the maturing interest, the company giving as security what are termed its "land income notes." These drew interest at twelve per cent, were to be countersigned by

Spencer as "trustee of the series," were payable in six years, and pledged, as collateral, the whole fund in the hands of Spencer. I assume that with this loan the coupons immedi-ately maturing were either bought by the contractors or paid by the company. But the road was still incomplete and more money was needed for that, and one of the consequences of the disregard by the trustees of the mortgage conditions was soon manifested. The company, to obtain such money, increased the amount of their land income notes to $300,000, using the increase to complete the road, which the con-tractors were bound to finish. I discover no other charge beyond these notes imposed on the Spencer trust. But these measures did not avail. In July, 1875, there was another default in the payment of interest, and in December of that year the trustees began a suit in foreclosure. We must assume that they were requested so to do by twenty-five per cent in interest of the bondholders, and that the proper indemnity was given or waived. Thereafter the trustees, under the authority of the mortgage solely, and without judi-cial intervention, took possession of the railroad and began to operate it, and eventually joined with the bondholders outside of the plaintiff and a few others in a plan of reorganization that contemplated the substitution of three mortgages for the first mortgage and some other obligations of the company. One of these mortgages for $400,000 was made a first lien on all the property of the company. The other two were framed for a reduced rate of interest. To this plan the plaintiff never assented, but the trustees adopted it, assumed to waive all existing defaults under the first mortgage, and agreed to waive them in the future; applied some part of the pro-ceeds of the land fund to payments of interest and principal of the new preferred mortgage; and notified the plaintiff that they should pay such proceeds indiscriminately upon the new bonds as well as the old. Before this action was commenced they had paid on the preferred mortgage almost $80,000, ignoring the plaintiff and paying him nothing; and when, after the commencement of the action, they began payments

to him, these were not made in accordance with his rights, but as if he assented to the reorganization scheme which he steadily repudiated. It is conceded that the trustees have on hand, as proceeds of land sales applicable to the purposes of the sinking fund, $100,000, with which they propose to buy preferred or first or second series bonds issued under the reorganization scheme.

The Special Term prohibited that action, and declared the new bonds utterly void as against the plaintiff. The General Term concurred in that result, and, on defendants' appeal, we are to determine whether that decision is right.

It is first met on the part of the defendants by a protest against any exercise of the jurisdiction of the court founded upon the alleged fact of the pendency of the foreclosure suit, with its supplemental bill in the Federal court in Wisconsin.

No such defense was pleaded. The plaintiff came to trial without warning or preparation to meet any such issue. We have held, at the present term of the court, that a defense in equity that the court ought to refrain from the exercise of its conceded jurisdiction is never available unless pleaded, and where the anwer is silent, amounts to a submission of the issues to the judgment of the court and a consent that upon those issues its judgment may be exercised. (*Town of Mentz* v. *Cook.*)     *     *     *

The principal relief granted, and which the trustees on their appeal ask us to reverse, is a decree compelling them to pay the procceds of the land sales in their hands, and such as they have misapplied in due and ratable proportion upon the plaintiff's bonds, and adjudging to be void as against him the new preferred mortgage and the two added securities. That is simply holding the parties to the conditions of the mortgage, and compelling the trustees to act in accordance with the terms of their trust. The scheme of reorganization could only be made effective in one of two ways — by the consent of all the bondholders, or by a foreclosure cutting off their lien, and so enabling a new corporation to make its own mortgages in its own way. The plaintiff had a clear right to stand

upon his contract, and the trustees had no power or authority to compel him to make a new and different one. We are not concerned with his motives, but only with his rights. Without his consent, the company and the trustees, the other parties to the contract could not vary its terms and divert to new securities the funds pledged by the mortgage to its payment. The proposition is almost too plain for argument. Unless railroad syndicates or committees are to be put above the Constitution, the trustees cannot set aside and change their contract with plaintiff, of their own volition, without his consent. The authorities for any such right are necessarily either unsound or inapplicable; and an illustration of their lack of pertinency is found in *Canada Southern R. Co.* v. *Gebhard* (109 U. S. 527). In that case the scheme of reorganization, which modified and changed the contract rights of the bondholders, was authorized and legalized by a special enactment of the Dominion parliament, and the Federal court said of it that since no constitutional obligation prevented in that jurisdiction a destruction of the contract and a substitution of a new one, such legislation must prevail and govern the rights of the parties. But the court said, also: "In the absence of statutory authority, or some provision in the instrument which establishes the trust, nothing can be done by a majority, however large, which will bind a minority without their consent." Here the trustees are not a legislature, and if they were, would be checked by the Constitution, which permits no arbitrary tampering with contracts, and protects the rights thereby secured. The cases cited to show that this plaintiff was not entitled to any greater rights because of the reorganization scheme, show, also, that he was fully entitled to his original contract rights. In *Stevens* v. *M. H. R. Co.* (L. R., 8 Ch. App. 1064), the substance of the court's doctrine was embraced in the pithy sentence: "We ought to take care that his interests are not prejudiced by the scheme; but, on the other hand, it would be very wrong to hold that he has acquired by it a priority over every one else."

The trustees defendant had no right in the present case to

waive and condone defaults of principal and interest upon plaintiff's bonds; they had no right as against him to assent to and recognize a new mortgage given priority over his; they had no right to divert to that new security money applicable by the existing contract to the payment of his bonds. Theoretically, all this the trustees admitted.

In their letter of March 4, 1882, they explicitly promise not to apply any of the proceeds of the sinking fund otherwise than to the purchase and redemption of the first mortgage land grant bonds of said company. And in their answers they admit his right as a non-assenting bondholder to his due proportion of principal and interest upon his bonds out of the proceeds of the land grant; and yet they sought to reduce that due proportion by a prior application of more than $100,000 upon the preferred mortgage.

They endeavor to justify this in various ways. It was argued that since the scheme of reorganization was tantamount to and took the place of a distribution after foreclosure, and on such distribution a court of equity would prefer certain debts and obligations over the mortgage bonds, the trustees were justified in giving a similar preference, and the $400,000 mortgage covered such claims and no others. To this there are several answers. The trustees are not a court of equity and have no right to award preferences, least of all to anticipate what such a court, with the facts all before it, would or would not do.

But there is no preferred mortgage which has actually taken effect or superseded the original mortgage. The whole scheme of reorganization is *in nubibus*, and simply proposed and inchoate. The new mortgages are held in *escrow* and never yet have taken effect by delivery. On the contrary, the bondholders who have exchanged preserve their old bonds as unpaid and uncanceled and living obligations of the company, and upon them thus existing the land proceeds must be applied, and not upon a preferred mortgage held in *escrow* and which never may become operative through failure of the conditions of delivery

Nevertheless, let us discover, if we can, what indebtedness the preferred mortgage was intended to secure. The facts are in a state of unusual doubt and confusion. In a supplementary brief, the plaintiff's counsel points out five different statements or claims made in the record as the basis of that mortgage. The whole record is meager and confused and makes our steps perilous; but, as I have once already taken the facts from the defendant's brief, I shall assume now that the debts secured by the preferred mortgage are those stated in the formal scheme of reorganization which the trustees approved. It has been suggested that we ought to take it from the referee's report. But the defendants' answers are conclusive admissions. They, in terms, aver that the scheme the trustees approved and seek to carry out is that a copy of which is attached to their answer, and the referee himself finds and identifies that precise " plan." His description of it is very general, but not at all contradictory of its precise terms as admitted in the answers. We do not err, therefore, in relying upon that.

The first two items are the sum of $71,218.15 for interest on unfunded coupons, under scheme of July 1, 1875, and the sum of $24,000 to those who did not fund their coupons, but whose interest upon the certificates remains unpaid. This is an effort to secure for interest upon interest, a preference not only over coupons later maturing, but over the principal of the mortgage itself. Whatever else may be said about it, we may safely assume that it could have no such preference or priority.

The next item is for holders of land income notes, $280,000. So far as these represent an expenditure for completing the road, which is about one-half of the total, it is not at all certain that any court would award a preference. In *Dunham v. C. P., etc., Railway Co.* (1 Wall. 254), a mortgage on the road built and to be built, was given its priority of lien upon a part thereafter constructed at the cost of the contractor and under an agreement that he should retain possession until paid. Our own views of such preferences have been recently

expressed (*Raht* v. *Averill*, 106 N. Y. 423); and we decided that the lien of a mortgage attaches not only to the land in the condition in which it was at the time of the execution, but as changed or improved by accretions or by labor expended upon it, while the mortgage was in existence; and creditors whose debts were created for money, labor or materials used in the improvement acquired no legal or equitable claim to displace or subordinate the lien of the mortgage for their protection.

So far as the income notes represented the $150,000 of interest coupons which matured in 1875, and which the contractors bought, several suggestions occur to us. While it may be that the over-due coupons bought by the contractors before 1875, were purchases and not payments, because the then owner of plaintiff's bonds assented to the arrangement, no such fact is proven as to the purchase of 1875. As to those coupons there is not a word of evidence that those who accepted their money made or intended a sale. (*Union Trust Co.* v. *Monticello & P. J. R. R.*, 63 N. Y. 311.) Those coupons as against the bondholders must be regarded as paid. In *Ketchum* v. *Duncan* (96 U. S. 659), where modifying circumstances were shown and the transaction was regarded as a sale, there was yet a very formidable dissent.

But conceding that there was a sale, yet these coupons in the hands of the contractors were not entitled to any preference. (*Dunham* v. *Railway Co.*, *supra*.) They were bound by their contract to buy them, and as holders stood simply like the others. On the basis that the reorganization is meant to be the equivalent of a distribution on foreclosure, so as to open the question of equitable preferences by the court, and such "arrangement acts" are a species of "bankrupt acts" (*Can. Southern* v. *Gebhard*, *supra*, 535, 541), the mortgage explicitly forbids any such preference. The provision in article tenth of the mortgage for payment in the order of maturity relates apparently to the disposition of the earnings of the road and to a case not of ultimate distribution.

The final item going to make up the preferred mortgage is

an estimate of interest likely to accrue before settlement on the previous items.

We discover, therefore, no ground, legal or equitable, upon which the preferred mortgage can stand as against the plaintiff, and the judgment as modified by the General Term was right, unless those modifications, upon the plaintiff's appeal therefrom, should be deemed erroneous.

Our consideration of that subject has led us to the conclusion that those modifications should be sustained.

There is an express finding that the trustees, though acting erroneously, proceeded in good faith. It would be difficult to sustain that finding were it not for the fact that their omission to make payments upon plaintiff's bonds until after he had sued, has a reasonable explanation. He claimed more than was his right. He sought not only to defeat the effect of the reorganization upon his bonds, but to make that scheme the means of acquiring an undue preference for himself. He claimed to stand as if the whole assenting first mortgage bonds had been extinguished and the proceeds of the land grant and income from earnings were devoted to the few non-assenting bonds alone, and so sought payment in full by reason of the sacrifices of others. He failed in that effort deservedly, and the omission to pay had some excuse in his exorbitant claims and his hostile attitude. We are disposed, therefore, upon the finding of the referee, and the explicit provisions of the mortgage to approve of the ruling of the General Term that judgment should go against the trustees as such and not personally.

More doubt has attended our reflection upon the question of an order to continue the foreclosure, but the complaint is scarcely framed for such relief, and the proofs indicate that it might merely work mischief to one party without producing benefit to the other, and so we concur in the modification made in that respect.

The judgment of the General Term and the order denying the motion to correct and resettle the judgment, should be affirmed.

GRAY, J. In this case, which is for the second time presented to the court upon reargument, I agree with Judge FINCH's opinion in holding that the General Term were right in modifying the judgment so that it should be against the trustees, as such, and not personally. As to the point raised by the defendants' counsel, that there was an absence of necessary parties, I do not think it is tenable and I agree with the views, in that respect, which were expressed in the opinion at General Term. The new preferred bonds represent the land income notes and the trustees being made defendants, with the Wisconsin Central Railroad Company, all the parties are before the court who are necessary to an adjudication upon the plaintiff's cause of action.

As to the objection raised by the defendants' counsel to the jurisdiction of the court below, I fully agree in the views expressed in Judge FINCH's opinion. To be available as a defense, it should have been alleged in the answer or suggested upon the trial. Neither course being taken, the parties must be deemed to have waived it and to have submitted themselves to the jurisdiction of the court. The cause of action was one cognizable in itself by the court; for it was based on an alleged violation by the trustees of their duty towards the plaintiff, as defined by the terms of the trust deed, and the issue formed was, in fact, as to what were the plaintiff's rights under a construction of the provisions of that instrument. Nor do I think that it is for this court to say, on appeal, the objection not being taken by pleading or motion in the trial court, that the trial court should, *ex proprio motu,* have dismissed the complaint.

As to the main question in this case, which turns upon the transactions underlying the creation of the new mortgage and the issues of preferred and serial bonds secured thereby, and their effect upon the plaintiff's rights as an original first mortgage bondholder, I take a view somewhat different from that expressed in Judge FINCH's opinion, as rendered upon the prior hearing; while concurring in the

result that the judgment must be affirmed.　The first mortgage, which was executed in 1871 by the Wisconsin Central Railroad Company, covered all of the company's land grant, among other things, and some of its clauses provided for the application of the proceeds of the sales of land towards the formation of a sinking fund in the trustee's hands, for the security and ultimate redemption and cancellation of the first mortgage bonds.　Inasmuch as the making of this mortgage and the issuance of the bonds themselves were designed to obtain the means wherewith to construct the road, a provision was inserted looking to the possibility of the company's treasury being exhausted and its consequent inability to meet its interest obligations on the bonds.　The payment of interest was to be made by the company from the proceeds of the sales of bonds and the earnings of the road; and the fourth article of the mortgage prohibits the appropriation of any part of the proceeds of land sales to the payment of interest on bonds, unless the treasury be first exhausted.　Upon the happening of the event contemplated, it is then specifically provided that the company shall execute to the trustees, for the security of the bondholders, a seven per cent income bond, to an amount equal to the advance made by the trustees from the sinking fund, which should be entitled to interest before the application of the earnings of the road to the stockholders.　And, by a further provision, this income bond was to be redeemed by other bonds of the company, bearing the same rate of interest, but secured by a second mortgage of the premises described in the first mortgage.

A contract was made by the company for the construction of its road, under which the contractors were to receive all the bonds and stock of the company and all the earnings of constructed road during construction.　The company retained only its franchises, and the contractors assumed the entire responsibility of raising moneys by sale of these securities. The company never received any money during the period of construction and never paid out any.　The contractors sold the bonds they received, and as coupons matured on them took

them up.   These facts appear in the testimony of the defend-
ant Abbott and are undisputed.   Matters proceeded in this
wise until December, 1874, when it appears that the con-
tractors claimed to hold against the company upwards of half
a million of dollars, represented by these coupons.   At this
juncture they professed inability to advance further moneys,
and the January interest was unprovided for ; so the sinking
fund was resorted to for relief.   Such resort as was then had,
in my view of the case, was improper, if it was not illegal.
The conditions did not exist which permitted it, and, in fact,
it was done for the relief of the contractors.   By their con-
tract they had the possession of the road and were to operate
it for their own benefit; that is, they were to receive all of its
earnings during the period of construction.   Obviously, the
effect of such arrangement was to leave the company without
any sources of revenue, and the result would be, an inability
to meet any obligation, continuing from the period of organiza-
tion until the termination of the contract.   Thus it could not
be said that the treasury became exhausted in December, 1874,
as was required by the fourth article of the mortgage as the
prerequisite for the application of the proceeds of land sales
to the payment of interest on bonds.   But this article assumed
the existence of a condition of affairs, wherein the company
stood under the obligation to pay the interest and not, as was
the case here, the contractors themselves.   And this brings
me to the point of difference between Judge FINCH's opinion
and my own, which I have adverted to as existing ; which
does not, however, affect the conclusion, but which, in my
judgment, strengthens it.

   The legal effect of the arrangement between this company
and the contractors was, as between them, to render them the
debtors for the interest maturing during the time the contract
was in force, and their purchasing or taking up the coupons
was, in fact, the payment or extinguishment of the coupons.
The proceeds of the sales of the bonds, and the earnings of
the road, were the stipulated sources for the payment of the
accruing interest during the construction of the road, and

those sources, by the contract of the parties, were made over to and conducted into the hands of the contractors. They had agreed to pay the interest during their possession, and they were to reimburse themslves for that item of outlay, as they had to do for any other expenditures in their undertaking. Nor is the suggestion that they paid these coupons as agents for the company sound in principle ; for it would not be in accord with the legal or fair meaning of the undertaking between the parties. It would, also, seem that if agents, yet having the possession of all the principal's estate, a payment of an obligation of the principal of such a nature would be presumed to have been made from the property in the agent's hands, and would extinguish the obligation. But I cannot agree to the suggestion. The contractors, in legal contemplation, and as I think, in fact, assumed the payment of the coupons during construction. The bonds which they received, by reference to the mortgage, carried notice to them of the provisions of the mortgage, which, in its fourth article, provided that, "during the construction of the said railroad hereby mortgaged, the interest on the bonds intended to be secured hereby, shall be paid out of the earnings of the said road and the proceeds of the sales of the first mortgage bonds, and no part of the proceeds of the sale of land embraced in this mortgage, or intended to be, shall at any time be appropriated to the payment of interest on said bonds, unless the general treasury of the company shall be first exhausted."

The arrangement, therefore, which trustees and company united in making, with the object of securing this claim of the contractors for coupons paid by them, by the assignment of the contents of the sinking fund from the possession of the trustees to a third party, was illegal ; for the coupons were as absolutely dead in law as though paid directly by the company over its counter, and the assignment was a direct violation of the agreement in the mortgage. Coming to the consideration of the payment of the $150,000 of interest, about maturing in January, 1875, on the bonds, the situation, as between company and contractors, was, that it was a liability which the

contractors were still bound to provide for and which the company could not be supposed to be obligated for. Of course, as between the company and third parties holding the bonds, the company was bound for the January interest. But if such had been enforced against the company, and the trustees had simply aided the company by advancing from the land sales proceeds, constituting the sinking fund, the company would have had an offset against the contractors, and the sinking fund would have been protected by the obligation of the company in its income bond, as contemplated in the article of the mortgage referred to. But what was actually done was to help the contractors by assigning over the whole sinking fund, to be held as a security for the payment of their claim for paid coupons and for the advance by one or more bondholders of moneys to meet the coupons to fall due. This was clearly without warrant in the law; and of this illegality the bondholders, who advanced the funds to pay future coupons, had notice through their bonds and the provisions of the mortgage and their knowledge of the facts as to the contractors' claim. It is true the trustees received from the company an income bond and a second mortgage for this assignment by them of the sinking fund, and hereafter I shall advert to the fact in connection with the facts of the so-called reorganization.

The defendants admit that the contractors were vitally interested in preventing a default and its consequences, and they say that the contractors themselves set about raising the necessary funds to care for the January coupons; but they could not, as counsel claim, use the coupons in their possession, for they were in fact paid as to the company. However, the moneys were raised by the concert of action between contractors, company and trustees, and matters went on until the foreclosure action was commenced by the trustees, upon the default of the company in July, 1875, in December, 1875. Subsequently, and pending the action, the trustees entered upon the property and took possession under that mortgage. While in possession the so-called plan of reorganization was proposed and received the acquiescence of the trustees. It was in reality but a plan

for refunding the obligations of the company, and it was attempted to be consummated without the consent of all of the bondholders, or through the compulsory process of a decree and sale. Under this plan, a new mortgage was executed on the property, and preferred bonds were issued and given in exchange for $400,000 of claims against the company, variously described as consisting in land income notes, in payments to equalize interest on funded and unfunded coupons, under some scheme designated as the scheme of July 1, 1875, and in a sum to cover future accruing interest on these items. The other bonds, secured by this new mortgage, were subsequent obligations to these preferred bonds, and were issued to take up the prior first mortgage bonds ; the details of that scheme not being necessary to describe, in view of Judge FINCH's fuller opinion. I utterly fail to find any warrant in law, under the mortgage which defined the duties and powers of these trustees, for their consent to and participation in such a scheme, as by their answer is admitted. These claims were not entitled to precedence, or to priority of payment over the first mortgage bonds.

For reasons I have stated, the $280,000 of land income notes, issued against the trust created of the sinking fund proceeds, to aid the contractors, were not preferred debts of the company, and, for reasons stated in Judge FINCH's opinion, which I shall not repeat here, the balance of the $400,000 was equally not. At most, and overlooking the questionable legality of the transactions out of which they arose as claims against the company, they were entitled to the security of the fund pledged as collateral. How could they deserve protection to the extent of being secured by a prior lien on the mortgaged property ? The very terms of the mortgage contemplate no such possibility, and expressly provide that the trustees shall receive for their advances from the sinking fund to pay interest, which the company has not the means to pay, and to secure the first mortgage bondholders, whose security is thus impaired, an income bond, to be redeemed by other bonds secured by a second mortgage of the premises. The

assignment by the trustees of the sinking fund recognizes this distinctly. Nor did the holders of the land income notes, by surrendering the proceeds of the land grant sales in their trustees' hands, thereby become entitled to any priority over the first mortgage bondholders in equity. For, again assuming the legality of the transactions underlying the issue of these notes, the relinquishment of the specific security for their repayment of itself is ineffectual to promote their claim over that of the first mortgage bondholders, in the absence of the consent of all parties. No rule of law recognizes any such right, and I am aware of no principle of equity upon which a party may become preferred as a creditor over another by a voluntary surrender, or relinquishment of his security, and such this must be deemed to be, in the absence of the consent of every prior bondholder, or of proceedings had *in invitum.*

The trustees should have proceeded with the foreclosure action, and they had no power to waive subsequent defaults and to release the company from its obligations to their *cestuis qui trustent* and from causes of action, as they did in 1879. In changing the contract by releasing the company and in consenting to a new mortgage, under which the claims of their *cestuis qui trustent* were deferred in order of payment, the trustees violated their legal duty to this plaintiff and rendered themselves amenable to this action. They were vested with no such discretion as would authorize them to change or impair any legal right of the plaintiff. The mortgage did not confer any such authority, and the consent of every bondholder could not do so. Their duty to the bondholders was to them severally, and they were not at liberty to follow the advice or wishes of the majority, being still liable to the minority for a faithful administration of their trust. (*Sturges* v. *Knapp*, 31 Vt. 1.) With the motives of the plaintiff we are not concerned, while he has legal rights which have been disregarded and which his trustees' action threatens to disregard.

The argument that these preferred bonds worked no harm to the original bondholders I do not regard as sound. They do not equitably represent debts which are entitled to priority of

payment. Their issue, and payments upon them of interest and of principal, are not within the terms of the original first mortgage, which represents the contract between company, trustees and the holders of bonds, and are distinct departures from that contract. All that instrument contemplated, in the event of the application of the proceeds of land grant sales to the payment of interest when needed by the company, was that an income bond should be given by the company to the trustees, ultimately to be redeemed by the issuing of bonds of the company secured by a second mortgage. It is plain that the possession by the trustees of such an income bond, the interest on which was payable before payments to the stockholders, operated as amply as a security for the first mortgage bondholders as they could possibly, in the nature of the exigency, expect.

I have discussed these questions more at length than I had intended and, perhaps, more, in view of the elaborate opinion of Judge FINCH, than was absolutely necessary, and I shall add no more. I concur in Judge FINCH's opinion upon all matters which I have not touched upon here, and I agree in his conclusion that the judgment and order appealed from should be affirmed.

DANFORTH and PECKHAM, JJ., concur for affirmance of judgment; RUGER, Ch. J., EARL and ANDREWS, JJ., dissent; the two latter on the ground that the point that the contractors were bound by their contract to pay the interest coupons as their own debt is contrary to the specific finding, which is supported by evidence, and that it is manifestly improper to affirm the judgment on a question of fact contrary to the findings.

All concur for dismissal of appeal from order.

Judgment affirmed and appeal from order dismissed.