SCHROEDER, Trustee, Respondent, vs. ARCADE THEATER COMPANY and others, Appellants.

SCHROEDER, Trustee, Respondent, vs. BERLIN ARCADE REAL ESTATE COMPANY and others, Appellants.

*March 11—October 18, 1921.*

*Mortgages: Trust deeds: Nature and legal effect: Construction: Equities subsequently accruing: Priorities: Trustee: Representative capacity: Authority: Source of powers: Duty to use good faith: Subjecting trust deed to lease: Real parties in interest: Estoppel: Entry after condition broken: Attornment: Relation between trustee and tenants of mortgagor: Foreclosure: Trustee as party in individual capacity: Interpleader: Accounting by trustee: Default of mortgagor: Notice: Failure to pay taxes: Interest advanced by trustee: Subrogation: Unauthorized act of trustee: Who may question: Second mortgagees: Marshaling assets and securities.*

1. A deed of trust is a security for money advanced under the bond issue, and in legal effect is nothing more than a mortgage, title to the property remaining in the mortgagor and the mortgage merely securing the debt. The right of a mortgagee who has secured peaceable possession of the mortgaged premises after condition broken to retain them until the debt is paid, is not based on any title in him, but upon his equitable right to be paid without being put to the costs of an action.

2. Trust deeds, although of comparatively recent origin, are to be encouraged because they offer an opportunity of investment to the public at large in remunerative and successful enterprises and because they have a tendency to bring about a mutuality of interest and better understanding among employers and employees generally. The salability of the bond

issue depends upon the fixed and unshakable security of the trust deed, and therefore the general rule has been evolved that a fixed legal right under a mortgage cannot be impaired by any equity subsequently arising.

3. The trustee of the deed of trust in some respects represents the bondholders, in other respects the mortgagor, and in still other respects both bondholders and mortgagor; but the provisions of a mortgage are not personal to the mortgagee, but are for the benefit and security of the mortgage debt.

4. The authority of the trustee to act for the bondholders is prescribed and limited by the terms of the trust deed; and an analysis of the provisions of the instrument here involved discloses that the contracting parties appreciated that the rights, powers, duties, and privileges of the trustee depend upon the trust instrument.

5. Since by the trust deed the trustee is required and obligated to act in a dual capacity, it is incumbent on him, in the execution of his duties and powers, to use the utmost good faith towards all parties in interest.

6. Where the owner of a ninety-nine-year lease on real property erected a substantial building, and upon the property thus improved placed a large bond issue maturing five years from its date, and subsequently made a fifteen-year lease with a theater company which expended considerable sums in alterations of the building, the fact that representatives of the theater company, before any default in the conditions of the trust deed, interviewed the trustee and discussed the terms of the proposed lease, and that the trustee approved both the lease and the proposed alterations, did not make the trust deed subject to the lease, as the trustee was not authorized, expressly or by necessary implication, by any of the provisions of the trust deed, to subject the trust deed to a subsequently-made lease.

7. The real party in interest is not the trustee but the bondholders, and since they had no knowledge of the lease of the theater company or of the proposed changes, and the trustee having no authority to make a lease, the bondholders are not estopped from claiming the priority of the trust deed over the lease.

8. The assignment of rents to the mortgagee, followed by notices of such assignment, served by both mortgagor and mortgagee on the theater company, and the payment of rents to the mortgagee thereafter, did not establish the relationship of landlord and tenant, as the law of attornment does not apply as between the tenant of a mortgagor and the mortgagee in those states where the legal title does not pass to the mortgagee.

Schroeder v. Arcade Theater Co. 175 Wis. 79.

9. After entry by the mortgagee upon condition broken he may treat tenants under leases subsequent to his mortgage as trespassers, or he may recognize them as his tenants. In this case, where the mortgagee entered after condition broken, collected rents, and immediately commenced foreclosure, it is *held* that the mortgagee manifested his intention of not treating the tenant as a trespasser, but of treating him as a new tenant under a lease terminating upon the sale of the property in the foreclosure proceedings.

10. A trustee foreclosing a trust deed cannot be considered a party as an individual unless he is impleaded in his individual capacity.

11. Failure to use reasonable diligence, or an abuse of his discretionary powers, renders a trustee under a trust deed personally liable to the party injured for the damages done.

12. Under secs. 2610 and 2656a, Stats., the court could have permitted the interpleading of the trustee as an individual, even after the trial of the issues had proceeded for a period of two weeks, so as to enable an accounting and a final adjudication of the issues presented by defendants, who claimed that the trustee had misappropriated funds.

13. The right to interplead a third person under secs. 2610 and 2656a, Stats., is discretionary with the court, but an order denying a motion to bring in a person who may be a proper but not a necessary party is not appealable.

14. A trust deed which provided that in case a default in the payment of interest continued for six months after written demand for payment, or in case default should be made in the performance of any of the provisions of the trust deed or in the lease which was mortgaged under such trust deed it was lawful for the trustee, and upon request of a designated number of bondholders it was his duty, to enforce by foreclosure or otherwise the terms of the trust deed, and which provided further that in case of default by the mortgagor in the performance of the conditions of the lease, one of which was the obligation to pay taxes, the trustee might declare the whole debt due,—authorized the trustee without a meeting of the bondholders, upon failure of the mortgagor to pay taxes, to declare the principal due and to proceed to a foreclosure.

15. Although the lease provided that any successor in' interest of the lessee was entitled to six months, after written notice, to comply with any provision of the lease alleged to have been breached, the trust deed is construed to authorize the trustee to declare due and foreclose the whole issue upon default in payment of taxes.

16. Where the evidence showed that the trustee had advanced moneys for the payment of interest and held the matured interest coupons as security for such advances, the trustee is subrogated for the payments so made to the interest of the bondholders under the coupons.

17. If the trustee misapplied the proceeds of the bond issue by authorizing the mortgagor to expend the same for purposes other than as limited by the trust deed, the bondholders might, by appropriate pleading, have enforced an accounting as to such improper expenditure, but they might also rely on the security of the trust deed. The clause in the trust deed as to the expenditure of the proceeds of the issue is a personal covenant between mortgagor and bondholder, which in no manner inures to the benefit of the second-mortgage bondholders, and does not run with the land so as to enable the latter to take advantage of it.

18. The doctrine of marshaling of assets and securities is recognized in this state and should be applied wherever available, if the same does not work hardship or inequity to the interests of the first-mortgage bondholders; but this doctrine is inapplicable where the paramount creditor is sought to be compelled to exhaust a mere personal remedy.

ESCHWEILER, J., dissents in part.

APPEALS from a judgment of the circuit court for Milwaukee county: E. T. FAIRCHILD, Circuit Judge. *Affirmed.*

This is an action brought by the plaintiff, as trustee for bondholders, to foreclose a certain mortgage in the form of a trust deed, executed by the defendant *Berlin Arcade Real Estate Company* (hereafter referred to for convenience sake as *"Real Estate Company"*).

The *Real Estate Company,* in the year 1912, was the owner of a ninety-nine-year lease upon the following described real estate, to wit: *Lots numbered fourteen (14) and fifteen (15) in block numbered twelve (12), in W. P. Young's subdivision, in the Thirteenth ward of the city of Milwaukee, Milwaukee county, Wisconsin,* which lease it held under and pursuant to an assignment from the Realty Investment Company, a corporation, the lease having been entered into on the 27th day of April, 1912, by and between

Maria Niemann, of Milwaukee, Wisconsin, and said Realty
Investment Company.

On the 28th day of June, 1912, the *Real Estate Company*
executed a trust deed or mortgage on its leasehold interest,
for the sum of $125,000, to the plaintiff *Edward Schroeder,*
as trustee for bondholders, to secure the payment of 250
bonds, each bond being in the sum of $500 and being num-
bered consecutively as numbers 1 to 250, inclusive, bearing
interest at the rate of six per cent. per annum, payable
semi-annually, in accordance with certain interest coupons
thereto annexed, the principal of the bonds being payable
under the terms thereof on the 1st day of November, 1917.
This trust deed constituted a first mortgage upon the lease-
hold interest of the *Real Estate Company.*

On the same day, to wit, the 28th day of June, 1912, a
second mortgage or deed of trust was executed by the *Real
Estate Company* on said property to the plaintiff, *Edward
Schroeder,* as trustee for bondholders, for the purpose of
securing the payment of 100 bonds, each for the sum of
$500, or a total of $50,000. Said second trust deed or
mortgage constituted a second mortgage upon said real es-
tate, subject to said first mortgage for $125,000.

The plaintiff continued to act as trustee under both of
said mortgage bond issues until the 28th day of June, 1916,
at which time he resigned as trustee under the second
mortgage, and shortly thereafter commenced this action of
foreclosure on the first mortgage or trust deed. Subse-
quently, and by proceedings duly had, the defendant *Leon-
ard Leidig* was duly appointed by the court as trustee under
the second trust deed or mortgage, and was made a party
defendant to the foreclosure proceedings.

In and by the ninety-nine-year lease above referred to,
executed by the said Maria Niemann to the Realty Invest-
ment Company, the said Realty Investment Company, its
successors and assigns, agreed, under what is known as the

third paragraph of said lease, to erect upon the leased premises, within five years from the date of the lease, a new business building of modern construction, not less than four stories in height, at a cost of not less than $75,000, and to insure and keep insured such building, when so erected and constructed, against loss or damage by fire in the sum of $30,000 in good and responsible fire insurance companies, the policies of insurance to be assigned and delivered to the lessor and to be held by her as security for the faithful performance by the lessee of the terms and conditions of said lease. In and by said lease the lessee also covenanted and agreed that "the new building so to be erected shall be substantial, and shall in every respect comply with the laws, ordinances, and regulations, municipal or otherwise, that may govern the construction of the same, and shall save said lessor harmless of and from any loss or damage by reason of the construction of said new building and by reason of any mechanics' liens or incumbrances of any kind or nature."

Said ninety-nine-year lease also contains what is known as the eleventh paragraph thereof, which provides as follows, to wit:

"It is understood and agreed that it will be necessary that the buildings and improvements now upon said lands be removed or demolished . . . as hereinbefore provided, to make room for the new building to be erected by the lessee, and that lessee may make alterations in any building from time to time, but shall not make such as will substantially depreciate the value of any building."

In other respects said ninety-nine-year lease contains provisions of the usual and ordinary nature of documents of that kind.

The mortgages above referred to were executed for the purpose of raising money to pay in part the cost of the erection and construction of said proposed new building and for other purposes.

Said first trust deed or mortgage, among other things, contains the following provisions, to wit:

"Now, therefore, this indenture witnesseth, that the mortgagor, for and in consideration of the premises and of $1 received by it from the trustee, and in order to secure the due and punctual payment of the principal and interest of all of the bonds issued hereunder, and at any time outstanding, does hereby convey and assign unto the trustee, his successors and assigns forever, all its right, title, and interest in, to, and under said lease, hereto annexed and marked 'Exhibit A,' and to any and all future income, rents, and revenue from the lease and leased property and any part thereof."

The *habendum* clause of said trust deed, among other provisions, contains the following:

"That until default shall be made and continued by the mortgagor in the payment of the principal or interest of any of the said bonds hereby secured as hereinafter provided, or until default shall be made and continued in respect to some act, thing, obligation, or agreement herein required to be done, performed, or kept by it as hereinafter or in said lease provided, the mortgagor shall be permitted to possess, manage, use and enjoy said property and the improvements, appurtenances, rights, and privileges, and to take and use the incomes, revenues, rents, and profits thereof as if this mortgage had not been made."

Said trust deed or mortgage also contains an agreement on the part of the *Real Estate Company* to the effect that the leased premises shall be maintained and shall not at any time during the continuance of the mortgage be torn down or removed without the consent of the trustee and all of the holders of the bonds issued under said first bond issue, and in the event of the destruction by fire or otherwise the said mortgagor will repair or rebuild the same forthwith, or erect a new building of equal value, to cost at least the sum of $125,000, and that in the event that the mortgagor fails within ninety days after the damage or destruction of the building to repair or rebuild the same, it shall become lawful

for the trustee, and it shall be his duty, upon a demand in writing signed by the holders of one third of the bonds then outstanding, to enter and take possession of the demised premises and exclude the mortgagor therefrom, and repair, rebuild, and replace the building upon said premises in as good condition as the building was before such damage had occurred, and to pay for the rebuilding and repair of said building out of the moneys received on the insurance loss.

In connection with the foregoing provisions with respect to the rebuilding and repair of the building upon the premises damaged or destroyed by fire, said trust deed or mortgage also contains the following provision, to wit:

"The mortgagor will and the trustee may in all things keep, observe, and perform all the covenants in said lease contained in respect to repairing, rebuilding, and replacing the building to be erected on said premises as in said lease provided to be done by the lessee."

The second article of the trust deed contains the following provision, to wit:

"The said mortgagor has contracted for the erection of a store and office building to be known as the Berlin Arcade Building upon said lands, and the trustee shall receive and hold all of said bonds, with full power and authority to sell and dispose of all or any of them at such prices and upon such terms and conditions as the trustee may deem advisable, and the trustee shall use and apply said bonds and the proceeds of any sale or sales thereof, in paying and liquidating the cost of erection of such building upon the said lands, and none of said bonds and none of the proceeds of sales thereof shall be used for any other purpose or purposes."

Said article also provides for the payment by the trustee of all sums due to contractors and materialmen employed in the construction of the building upon said premises under the written order and direction of one Robert T. Newberry, architect.

Among other provisions in said trust deed or mortgage is one authorizing the trustee to raise and borrow money

on the security of the mortgage, lease, and premises, or upon
any sublease, for the purpose of paying off any sum due
for interest, rentals, insurance, taxes, or other charges pay-
able by the lessee under said ninety-nine-year lease, or any
charges or any lien for the time being charged upon the
mortgaged property or any part thereof, in priority to the
trust deed, with such interest and upon such terms as to the
trustee may seem best.

Article 5 provides, among other things, as follows, to wit:

"In case default shall be made in the payment of any
interest on any of the bonds issued hereunder, and shall con-
tinue for the period of six months after payment of such
interest shall have been duly demanded in writing, or in case
default shall be made in the payment of the principal of any
of said bonds, or in case the mortgagor fails to keep the
buildings insured against loss by fire, as herein agreed, or
fails to pay the expense of effecting such insurance when due,
or shall fail to keep, observe, or perform any condition of
said lease by the lessee to be kept, observed and performed,
then and in every such event the trustee may, and upon a
requisition in writing signed by the holders of not less than
one third in amount of said bonds then outstanding, and
upon adequate indemnity," etc., furnished, "it shall be the
duty of the trustee . . . to enter upon all and singular the
said property, . . . and to exclude the mortgagor and its
agents (who shall forthwith surrender the same to the
trustee) wholly therefrom, and to have, hold, manage, con-
trol, and use the same, . . . and exercise all rights and
privileges pertaining thereto, and from time to time, and at
the expense of the trust estate, effect such insurance against
loss by fire, make all repairs and replacements and altera-
tions, additions, and improvements thereto, as may seem to
him necessary or judicious, and to collect and receive all
income, rents, issues, and profits of the same, and of every
part thereof ; and to apply the moneys arising as aforesaid to
the payment, first, of all rentals, insurance, taxes, and other
charges to be paid by the said lessee in said lease ; second,
the cost of repairing, rebuilding, and replacing and altering
said building and operating and caring for said property ;
third, a commission of three per cent. of the rentals collected

to the trustee for his services, to be computed monthly; fourth, to set aside and retain as a sinking fund to pay semi-annual interest on said bonds and coupons, and to pay the principal of said bonds, all of the remainder of the moneys so received by the trustee, and apply the sums retained as far as they will extend in the payment of the semi-annual interest on said bonds and coupons, and then on the principal of the bonds which may be at that time due and unpaid," etc.

Article 4 of the trust deed or mortgage authorizes the trustee, in case the mortgagor fails to keep the buildings insured against loss by fire as provided for in said mortgage, or in case it fails to keep and perform any of the conditions of said lease, to elect and to declare the whole amount of the principal of said bonds to become due and payable, and that upon the exercise of such election the whole amount of the principal of such bonds shall become immediately due and payable; and article 6 of said trust deed or mortgage authorizes the trustee, in the event of default in the payment of any of the principal of any of the bonds when the same shall become due and payable, or in the event of a failure on the part of the said *Real Estate Company* to perform any of the conditions of said trust deed or mortgage after having exercised his option or privilege to declare the whole amount of the principal of said bonds due, to commence and prosecute an action of foreclosure.

Said trust deed or mortgage also contains a provision authorizing the trustee, after entry upon conditions broken, to sell the mortgaged property in accordance with the terms and provisions of said trust deed.

Pursuant to the provisions of said ninety-nine-year lease the *Real Estate Company* proceeded to and did erect and construct upon said leasehold estate a substantial building, four stories in height, it being its object and design to lease said building to tenants for stores and offices.

In the year 1914 the defendant *Berlin Arcade Theater Company* (hereinafter referred to as *"Theater Company"*)

was organized as a corporation for the purpose of leasing and operating as a theater a portion of the building belonging to the *Real Estate Company* and situated upon said leasehold estate; and one Hugo Heller, one of the organizers and promoters of the *Theater Company,* and one Frank P. Burke, an attorney for the *Theater Company,* entered into negotiations with the *Real Estate Company* for a fifteen-year lease of a part of the *Real Estate Company's* building for theater purposes, and examined the records of the office of the register of deeds with respect to the title of the property of the *Real Estate Company;* and upon such examination discovered and were informed of said trust deed or mortgages and the terms and conditions thereof, and thereafter had an interview with *Schroeder,* the trustee for the mortgage bondholders. These representatives of the *Theater Company* personally saw *Mr. Schroeder,* the trustee, on two or three different occasions before the lease to the *Theater Company* was negotiated and executed, and discussed with him the general terms and conditions of the lease and also the matter of making certain alterations, etc., in the building, which, among other things, consisted in converting a certain arcade, running from Third street through to North avenue, into a theater lobby, and to convert the rear portion of a store fronting on Third street into an auditorium for a theater. Among other work contemplated by said representatives of the *Theater Company* was the taking out of the stores that were on the inside of the arcade, to be used for the purposes of a theater, and also the raising of the ceilings and lowering of the floors.

Upon an oral discussion with *Mr. Schroeder* by both Mr. Burke and Mr. Heller of the terms of the proposed lease with the *Real Estate Company,* the trustee, *Schroeder,* expressed his satisfaction with such lease and also with respect to the proposed changes to be made in the building, so that the *Theater Company* might be properly accommodated and

housed. The rents to be paid by the *Theater Company* were also discussed and were approved by the trustee, *Schroeder.* The sum of about $3,000 was paid by the *Theater Company* to the trustee, out of which money part of the improvements to be made for the benefit of the *Theater Company* were to be paid. Furthermore, certain deposits were to be and were made by the *Theater Company* with *Schroeder,* the trustee, in order that such improvements might be paid for out of such fund and so as to avoid the possibility of the filing of liens on the building.

Before the lease was drawn *Schroeder* also suggested that there be incorporated therein certain conditions with respect to insurance, in order to protect parties interested from damages for personal injuries received by persons in the theater and during building operations.

After the lease had been prepared a request was made by the representatives of the *Theater Company* of *Mr. Schroeder* as trustee to sign the same, but he refused to comply with this request.

The contemplated changes in the building to accommodate the theater were made at an expense of about $15,000.

At the time of the execution of the lease with the *Theater Company* there had been no default by the mortgagor of the terms and conditions of the said mortgages, and the *Real Estate Company* was in possession of the premises.

About the time of the execution of the lease with the *Theater Company* the *Real Estate Company* assigned and transferred to *Edward Schroeder* the rents accruing from the said lease, and notice of such assignment was given in writing by the *Real Estate Company* to the *Theater Company* on or about the 15th day of September, 1914; and on the 9th day of December, 1914, *Schroeder* notified in writing the *Theater Company* of the assignment of the rentals from the *Theater Company* to him and requested that payments of rent be made to him, the said *Schroeder.*

On or about the 2d day of October, 1916, default having

been made by the *Real Estate Company* in the payment of interest on the bonds and taxes on the real estate, and on account of failure to meet the terms of the ninety-nine-year lease, the said *Schroeder,* as trustee for bondholders, caused to be served upon the said *Real Estate Company* a notice in writing, under and by the terms whereof, on account of the defaults above referred to and pursuant to the provisions of the first trust deed or mortgage, he elected to declare, and declared, the whole amount of the principal sum of said first-mortgage bonds, together with the interest thereon, as due, and demanded immediate payment thereof, and also notified said *Real Estate Company* that in the event of a failure to comply with said request for payment forthwith an action would be begun to foreclose said first trust deed or mortgage.

Pursuant to the provisions of said trust deed or mortgage and on account of the default of the mortgagor, the plaintiff *Schroeder,* as such trustee under the first trust deed or mortgage, entered upon and took possession of the property of the said *Real Estate Company,* and thereupon and thereafter collected all the rents accruing from said property and did all things which he was authorized to do under and pursuant to said first trust deed or mortgage.

Foreclosure action in behalf of the trustee was thereupon commenced on the first trust deed or mortgage, and judgment demanded that any right, title, or interest that the defendant *Theater Company* had in and to said property by virtue of said fifteen-year lease be declared subsequent to the lien of the plaintiff as trustee under said first mortgage or trust deed. The defendant *Leidig,* as trustee under said second trust deed or mortgage, filed a cross-complaint, in and by which he prayed for judgment in his behalf and demanded substantially the same relief with respect to his said trust deed or mortgage as was prayed for by the plaintiff herein.

The defendants *Esbenshade,* as executrix, and *Hummel*

and *Leafgreen,* holders of second-mortgage bonds under said second trust deed or mortgage, were also made parties defendant to said foreclosure action, as was also one *Floyd E. Jenkins* as receiver of the defendant *Real Estate Company.*

The *Theater Company* answered, and among other things alleged that the *Real Estate Company* owned the building situated upon the leased premises herein referred to and the leasehold interest in the land, and owned no other property; that it was organized for the purpose of taking over said building and leasehold interest; that the building was a three-story building, designed for stores, offices, and a theater, and was not designed so that the whole building could be used by a single tenant; that the plaintiff knew that it would be necessary for the *Real Estate Company* to enter into leases with divers persons on various terms, so that it could pay its taxes, insurance, interest, rent, and the upkeep of the mortgaged premises; that the trust deed on which the plaintiff was foreclosing, and also the second trust deed, provided that, until default should be made and continued by the mortgagor, the mortgagor should be permitted to possess, manage, use, and enjoy the property and the improvements as if the said trust deed had not been made; that at the time the lease was entered into with the *Theater Company* the *Real Estate Company* was not in default and was still in possession of the mortgaged premises; that the *Theater Company* submitted the proposed lease to *Schroeder* as trustee, and was assured that said lease was in all respects satisfactory to such trustee, and that by reason of the actions of the plaintiff and his approval of said lease he was estopped to deny the validity of said lease.

By stipulation of the parties the issues raised by the plaintiff's complaint, the answer of the defendant *Leidig* as trustee under the second-mortgage bonds, and the answer of the defendant *Theater Company* were tried separately.

Upon the issues so raised by the *Theater Company* the facts above stated were substantially disclosed, and after such hearing the circuit court made and filed, among others, the following findings, to wit:

The court found that the *Real Estate Company* executed the bonds pertaining to the first trust deed or mortgage, and also the execution of the first trust deed or mortgage, and delivery of said first-mortgage bonds and of said first mortgage or trust deed to said plaintiff, *Schroeder,* as trustee; the acceptance by said *Schroeder* as such trustee; the sale and delivery of said bonds by said plaintiff, *Schroeder,* as such trustee, for the use and benefit of the *Real Estate Company;* that all of the first-mortgage bonds are outstanding and held and owned by persons other than the trustee and are wholly unpaid as to principal; that the said defendant *Real Estate Company* defaulted in the payment of taxes on said property and also in the payment of interest on said bonds; that pursuant to the provisions of said first trust deed or mortgage the plaintiff, on October 4, 1916, declared the whole amount of the principal and interest on said bonds as due and demanded immediate payment thereof, and that such demand was not complied with; and that upon such declaration of election of option and the service thereof the whole amount of the principal of said first-mortgage bonds, namely, the sum of $125,000 and interest, became due; and that this action to foreclose was commenced on or about the 11th day of October, 1916.

That on the 11th day of October, 1916, the plaintiff, as trustee, with the consent of the mortgagors and under the provisions of said first trust deed or mortgage, entered into possession of the mortgaged premises to conserve the same as security for the bondholders, collected the rents thereof, and used the same towards a reduction of the taxes and interest becoming due on the bonds; and that he retained and now retains possession of said premises.

The court also found the execution of the lease by the

*Real Estate Company* with the *Theater Company,* as above stated; that at the time said lease was executed there had been no default by the mortgagor; that the *Real Estate Company* was at that time in possession of the premises; and that said *Edward Schroeder* did not at that time, as such trustee, take possession of said premises.

That prior to the time the *Theater Company* entered into said lease its officers and representatives consulted with the said *Schroeder,* as trustee, and advised him of their intention of leasing a part of the premises in question for a period of fifteen years, and that it would be necessary to expend a large sum of money in order to change and remodel said building so that it would become suitable for theater purposes; that the said *Schroeder,* as trustee, expressed his satisfaction with the general outline of the proposed lease, but refused to give his consent in writing to the making of such lease, and that thereafter said lease was actually executed; and that the *Theater Company* proceeded to change and remodel the building for theater purposes at an expense of about $15,000; that said plaintiff, as trustee of both the first and second trust deeds or mortgages, did nothing which in any way interfered with the rights of the bondholders; and that it does not appear from the evidence that the plaintiff is estopped to assert the priority of the lien of said trust deeds or mortgages over the rights of said defendant *Theater Company* as lessee; and that the rights of the *Theater Company* are subsequent and subordinate to said two trust deeds or mortgages; and that the interests of all of the defendants are subsequent to the lien of the first mortgage.

Similar findings were thereupon also made by the court with respect to the second mortgage or trust deed. Also that the *Real Estate Company* is wholly insolvent; that eighty-one of the one hundred second-mortgage bonds were duly issued and sold by the *Real Estate Company.*

With respect to the issues so raised and pursuant to the findings of fact, and as conclusions of law, the court found that the plaintiff was entitled to the relief demanded in the complaint; that the defendant *Theater Company* was not entitled to any relief; that the plaintiff, and defendant *Leidig* as trustee under said second trust deed or mortgage, were entitled to judgment of foreclosure and sale in the usual form, and thereupon judgment was entered in accordance with such findings; from which judgment the *Theater Company* has appealed.

The issue presented on the appeal of the *Theater Company* involves substantially the following:

*Question No. 1.* Is the lease from the *Real Estate Company* to the *Theater Company* subject and subordinate to the first and second mortgages or trust deeds, and did the circuit court properly adjudge that the premises be sold free and clear of such lease?

It will be unnecessary in detail to go into the various answers of the defendants *Esbenshade, Hummel, Leafgreen, Jenkins* as receiver, or the *Real Estate Company,* for the reason that in substance the same issues are raised in somewhat different form by these respective answers. Among other things they allege that there was in fact no default on the bonds at the time of the commencement of the action; that the moneys received from the sale of the bonds and the rentals derived from the property and paid to the plaintiff, *Schroeder,* were sufficient to pay all necessary requirements and demands; that the plaintiff, *Schroeder,* collected from the sale of said bonds a large amount of money, aggregating a sum in excess of $20,000, which amount he applied to his own personal use and which amount he has failed to account for; that he, the said *Schroeder,* expended a large sum of money, aggregating the sum of about $8,000, being his own individual funds, for the installation of a bowling alley in said premises, all without authority and contrary to his du-

ties and obligations as trustee, and that in order to reimburse himself in part for such expenditures he used the moneys derived from said property and said bonds.

And it is further alleged that at the time of the purchase by *Hummel, Esbenshade,* and *Leafgreen* of the second-mortgage bonds held by them, it was represented to them by said *Schroeder* that all of the moneys derived by said plaintiff, *Schroeder,* from the sale of said first and second-mortgage bonds would be used in the erection and construction of the building to be erected upon the premises hereinbefore described and for no other purpose; and that a large amount of such money so derived from the sale of such bonds was converted by said *Schroeder* to his own individual use, to the great damage of the said second-mortgage bondholders and of said *Real Estate Company.*

Also that said *Schroeder,* as such trustee, in taking over the collection of rentals and in leasing the said building, was negligent in the execution of his trust, and by reason of such negligence such defendants sustained large damages.

The answers of these defendants also demanded an accounting that the plaintiff, as trustee for the first-mortgage bondholders, be required to exhaust all property and security to which he may be entitled by virtue of the alleged misappropriation of funds by the said *Edward Schroeder* before resorting to the mortgaged property; and for an accounting by the plaintiff of all moneys received by him as such trustee for rents collected and from other sources; and that the amounts found due from him be applied upon the amounts due upon the bonds secured by the first and second trust deeds or mortgages in such manner as may be just and equitable; and for judgment against the said plaintiff for the amounts unaccounted for by him, and for damages for his negligence as aforesaid, etc.

The foregoing does not set forth all of the claims of the respective defendants above referred to in regard to the

alleged mismanagement and misconduct, etc., of the said *Schroeder,* but the allegations are sufficient to show the general nature of such allegations and the relief demanded. Other issues raised will be referred to and treated in the opinion.

After the trial had proceeded for about two weeks an application was made by the defendants to implead the said *Edward Schroeder* individually, and testimony was ostensibly offered for the purpose of substantiating such allegations of misconduct, mismanagement, and misappropriation, and the court refused to implead said *Edward Schroeder* individually and to permit testimony to be received or introduced in proof of such allegations.

The principal question, therefore, arising and submitted to the court with respect to the answers of the defendants, other than the *Theater Company,* is substantially involved in the following:

*Question No. 2.* Did the court properly refuse to implead *Edward Schroeder* individually, to determine whether or not he is personally liable to any of the parties to the action?

For the *Arcade Theater Company* there were briefs by *Alexander & Burke,* attorneys, and *Bottum, Bottum, Hudnall & Lecher,* of counsel, all of Milwaukee; and the cause was argued orally by *George B. Hudnall* and *Frank P. Burke.*

For the *Berlin Arcade Real Estate Company* and others there were briefs by *Joseph G. Hirschberg* and *Horace B. Walmsley,* both of Milwaukee, and oral argument by *Mr. Walmsley.*

For *Leonard Leidig,* trustee, and others, there was a brief by *Glicksman, Gold & Corrigan* and *George A. Affeldt,* all of Milwaukee, and oral argument by *Walter L. Gold.*

*J. O. Carbys,* attorney, and *Lawrence A. Olwell,* of counsel, both of Milwaukee, for *Edward Schroeder,* trustee.

The following opinion was filed July 13, 1921:

DOERFLER, J.    We will first take up the issue raised by the answer of the *Theater Company* and as contained in question No. 1 set forth in the preceding statement of facts.

A deed of trust in this state is a mere security for money advanced under the bond issue, and in legal effect is nothing more than a mortgage. *Hoyt v. Fass,* 64 Wis. 273, 279, 25 N. W. 45. In fact, in the instant case, the trust deeds are characterized as mortgages.

It has been held in this state that the title remains in the mortgagor, and the mortgagee holds the mortgage as such, as mere security for the debt. So stringent is this rule that it has often been held by this court that a deed in fee simple absolute, given merely to secure a debt, with a parol defeasance, is nothing more nor less than a mortgage, leaving the title in the grantor and giving to the grantee a mere security for his debt, to be enforced like an ordinary mortgage (*Schriber v. LeClair,* 66 Wis. 579, 586, 29 N. W. 570, 889; *Wis. Cent. R. Co. v. Wis. River L. Co.* 71 Wis. 94, 36 N. W. 837; *Central Trust Co. v. Burton,* 74 Wis. 329, 43 N. W. 141); also that the right of the mortgagee who has got peaceable possession of the premises after condition broken, to retain them until his debt is paid, is founded upon his equitable right to be paid without being put to the cost of a suit, and not upon any title in him. *Brinkman v. Jones,* 44 Wis. 498, 512.

"By the common law, at first, mortgages became absolute deeds, if the terms of the defeasance were not strictly performed on the day; but courts of equity succeeded in establishing an equity of redemption of the mortgagor in the land, which remained an equity in him until the mortgage was duly foreclosed by process of law. Courts were astute in protecting this equity of redemption, and leaned strongly against all agreements between the mortgagor and mortgagee which abridged it. 'Once a mortgage always a mortgage' became a maxim. Therefore, when provisions began to be inserted in deeds which enabled the mortgagee to de-

stroy at once this equity of redemption, courts looked upon them with suspicion, if not with aversion, as devices intended to oppress and injure mortgagors, who are, from the nature of the case, more or less in the power of mortgagees. But, notwithstanding all opposition, the use of trust deeds has steadily increased, until they are common in England and in nearly all the states. They are regulated by statutes, and are under the jurisdiction of courts of equity, which can interfere, by injunctions, prohibitions, orders, and decrees, to prevent oppression and remedy abuses. A large proportion of the mortgage deeds of real estate now contain powers of sale in case of default, and the laws regulate and protect them." 2 Perry, Trusts, § 602c.

"Especially until condition broken, a trust deed does not divest the estate of the mortgagor. He can convey the estate, subject to the mortgage; he may make a second mortgage; the estate may be attached for his debts; the mortgagor is considered as having all the rights and powers of an owner, except so far as it is necessary to hold otherwise in order to give effect to the mortgage. The interest of the mortgagor may be levied upon and seizin delivered by the officer; in which case the creditor will hold in fee, subject to the mortgage. The same principles apply to the rights and title of the grantor in deeds of trust." 2 Perry, Trusts, § 602j.

The foregoing statements are made under the authorities cited to show the legal effect of the execution of a trust deed in this state with respect to the interests of the mortgagor and the mortgagee.

Trust deeds, particularly in recent years, have become a very popular security in this state, and but few large mortgages are now executed excepting they are in the form of a trust deed. In fact, this can be considered the age of trust deeds in this state as elsewhere, and hardly a day passes during the present period of economic readjustment but we read or hear of the flotation of a large bond issue in railroad, industrial, real estate, or other enterprises, and a very large percentage of the securities held by the people at large who make such investments for economic purposes are in the form of bonds secured by trust deeds executed to trustees.

Schroeder v. Arcade Theater Co. 175 Wis. 79.

It has also become a matter of common knowledge that at the present time, where as one of the results of the great war housing conditions have become very oppressive and facilities to furnish homes for the masses have become scarce, and where office space for professional men and others is at a great demand, and where rentals have been raised by landlords in many instances far in excess of the requirements of the situation, numerous corporations and individuals have become interested and engaged in the erection of tenement, apartment, and office buildings intended to house and accommodate a vast number of our population in need of such accommodations, and corporations have also sprung up, actuated by a spirit of civic pride and righteousness, to build homes to be leased to the masses, and in almost every instance the moneys are raised by the flotation of large bond issues; and these facts have been recognized in a large measure by statutes in our state, which authorize the issuance, regulation, and sale of these bonds under the supervision and authority of public bodies such as the railroad and insurance commissions of the state. These bonds are purchased by trust companies, bond and stock brokers, and other similar institutions and individuals, and are resold in a large measure to the rank and file of the people, who invest in the same in accordance with their means.

It is true that the issuance of bonds and the execution of trust deeds is of comparatively recent origin and that the growth of this practice has kept pace in a large measure with the enormous expansion of our commercial and industrial interests. Bond issues are to be encouraged rather than discouraged, for they afford an opportunity for frugal investors and the people at large to invest their savings in remunerative and successful enterprises and bring in closer contact the investors, who in a large degree are employees, with the institutions by whom they are employed, and so have a tendency to bring about a mutuality of interest and a better understanding between employers and employees generally.

From what has preceded it will readily be seen that the

question as to whether a mortgage in the form of a trust deed, when once executed, shall continue to be a fixed lien and hold its place as a first or second mortgage in accordance with the date of its execution and recording, becomes a matter of great importance not only to the investor but also to the borrower. To a large extent the salability of the bond issue depends upon the fixed and unshakable security of the trust deed, which is of prime importance to the investor. To the borrower this same consideration becomes of great importance, for upon the existence thereof depends his ability to float the bonds and to raise the necessary money for the purpose of which the bond issue has been designed. Therefore the general rule has been evolved, and is a fixed one in contemplation of law, that a fixed legal right under a mortgage cannot be impaired by any equity subsequently arising, although there is an apparent exception to this rule in the case of operating expenses, having practical application with respect to railroads, and also one pertaining to employees, who are frequently given preferred claims by statutes. 2 Elliott, Railroads, § 500.

And it is held that

"The priority of a first mortgage is not affected by the fact that the road was completed or part of it wholly built by money obtained by means of a junior mortgage, nor are unsecured claims of contractors or materialmen who have furnished money or material for building or repairing it entitled to priority over a prior mortgage." 2 Elliott, Railroads, § 500.

"And a mortgage trustee has no power to agree that an unsecured debt or a subsequent mortgage debt shall be paid in preference to the first-mortgage bonds." 2 Elliott, Railroads, § 500; *Duncan v. Mobile & O. R. Co.* 2 Woods (U. S. C. C.) 542; *Hollister v. Stewart,* 111 N. Y. 644, 19 N. E. 782; *Colorado & S. R. Co. v. Blair,* 214 N. Y. 497, 108 N. E. 840.

"A trustee has no authority to waive defaults or otherwise deprive bondholders of their rights." *Hollister v. Stewart, supra.*

Thus it will be seen from the citations and authorities that

the courts have carefully guarded and protected the interests of bondholders secured by a mortgage or trust deed, and have generally and quite universally accorded them the priority which was originally contemplated by the issuance of such bonds and the execution of such trust deeds or mortgages.

The floating of a bond issue is generally accompanied with the issuance of a prospectus, by which the investors are fully apprised of the nature of the security offered, the location and value of the property intended to be mortgaged, the object and purpose of the erection and construction of the building or buildings, the rental value of the building, the industry or business project to be accommodated by the erection of the building, and many other incidental facts involved in the matter of the security of the proposed bond issue.

In a vast number of these bond issues the property which it is intended shall form the basis of the security consists of buildings designed to be leased in whole or in part for manufacturing purposes, for tenements, for office and for commercial purposes.

In the instant case the building known as the Berlin Arcade Building was originally designed to be used for office and store purposes, and in fact the building was erected for that purpose, and the bonds were issued and negotiated in order to furnish a fund out of which to pay for the building to be used for that purpose, and for no other purpose.

It is also true that the investors in these bonds had in view this purpose for which this building was to be used, the location of the building, the construction of the same, and the rentals to be derived from the building, all of which elements, to a large degree, formed the basis upon which the value of the property was fixed and determined and the security of the bond issue estimated. If there was one thing over and above all others that investors in these bonds had in mind, whether they invested in the first-mortgage bonds

or in the second-mortgage bonds, it was the fact that the investment and the lien constituted by the respective trust deeds or mortgages would be and would constitute a fixed lien or security which could be defeated only by such considerations as arise by virtue of the terms of the trust deed or the law; as, for instance, unpaid taxes or failure to pay or meet the obligations under the ninety-nine-year lease, with respect to rentals thereunder or other obligations assumed thereby.

The trustee, under the provisions of the trust deed, in some respects represents the bondholders, in other respects the mortgagor, and in still other respects both bondholders and mortgagor.

"The powers of trustees under deeds of trust, and of mortgagees under mortgages with power of sale, depend entirely upon the terms of the deeds. Such powers are created by and exist in the deeds, and of course they exist in the terms in which they are created, and in no others. They are to be exercised by the trustees *in pais*. They are wholly matters of convention and contract between the parties, and not of law or jurisdiction. They can be exercised because they are conferred by one party upon another, and not because the law or the courts have conferred or authorized them. The statutes in some of the states have regulated their execution, but such statutes do not create the powers themselves." 2 Perry, Trusts, § 602*g*.

"The trustee, or mortgagee with the power of sale, holds the lands in trust for the purposes for which the trust deeds are made, which purposes are generally specified in the deeds thereof." 2 Perry, Trusts, § 602*l*.

A further legal doctrine must be borne in mind, and that is that the provisions of a mortgage are not personal to the party named in it as mortgagee, but are for the benefit and security of the real owner of the debt secured thereby. 27 Cyc. 1045, and note 56.

So that from the foregoing it becomes quite clear that in order to ascertain and determine the rights of a trustee under a trust deed or mortgage it is necessary to look to and

examine closely the provisions of the trust deed, for under such trust deed there is created not only the very office of the trustee but also his various duties, obligations, and powers.

The bonds and the interest thereon are made payable to the trustee, who for that purpose is constituted the agent to receive the money and to distribute it among the bondholders upon presentation of the bonds or the interest coupons. As has been said in *Connell v. Kaukauna,* 164 Wis. 471, 496, 159 N. W. 927, 160 N. W. 1035:

"The authority of the trustee to act for the bondholders is prescribed and limited by the terms of the trust deed, and a payment to the trustee merely as trustee cannot be held to be payment to the bondholders, unless made when and as prescribed by the terms of the bond." *Miller v. Mitchell,* 58 W. Va. 431, 52 S. E. 478; *Kransz v. Uedelhofen,* 193 Ill. 477, 62 N. E. 239; *Fortune v. Stockton,* 182 Ill. 454, 55 N. E. 367; *Schroeder v. Wolf,* 227 Ill. 133, 81 N. E. 13.

The bonds may be registered as to the payment of principal upon the books of the trustee, and in performing the office of registrar the trustee represents both the mortgagor and the bondholders.

In the event that the building upon the premises is destroyed by fire the insurance moneys shall be paid to the trustee, and the trustee shall thereupon hold said sum so derived from insurance and pay the same to various contractors, materialmen, and laborers in accordance with the certificates of the architect of the building, and in doing this the trustee represents both the interests of the mortgagor and of the mortgagee.

In the event of the failure of the mortgagor to keep the buildings properly insured, or in the event of his failure to pay the taxes or in any other respect to comply with the provisions of the trust deed, the trustee, under certain circumstances, shall have the right to declare the whole amount of the mortgage debt, both principal and interest, due, and

to foreclose the trust deed on mortgage, and with respect to
this provision the trustee represents the bondholders.   He
is also authorized, upon conditions broken, to enter into and
upon the premises and to possess the same, and thereafter
collect the rents, issues, and profits derived from the build-
ing, and in that regard he is the representative both of the
mortgagor and of the bondholders.

In the event of the failure of the mortgagor to pay the
rent due upon the ninety-nine-year lease or to pay the taxes
upon the property, the trustee is authorized, under the terms
of the trust deed, to pay such rent and to pay the taxes in
order to save and protect both the interests of the mortgagor
and the bondholders.

The trustee may also raise and borrow money on the se-
curity of the mortgage lease and premises, or upon any sub-
lease, for the purpose of paying off any sum due for interest,
rental, insurance, taxes, or other charges payable by the
lessee under the ninety-nine-year lease, and in doing this he
acts both as the representative of the bondholders and of
the mortgagor in order to protect the mortgaged property
from forfeiture under the terms of the lease.

And upon conditions broken, if the trustee takes posses-
sion of the mortgaged property, under the terms of the trust
deed he is authorized first to sell the real estate; second, to
apply so much of the proceeds of the sale as is necessary to
the payment of the debts secured by the deeds; and third,
to account for and pay over the balance, after paying the
expenses of the trust and the sale, to the grantor or mort-
gagor, his legal representatives or assigns.

The foregoing are but a few of the rights, powers, duties,
and privileges of the trustee as defined by the trust deed,
and they tend to show the appreciation on the part of the
contracting parties of what it was intended to make clear by
the foregoing, that the creation of such rights, powers, du-
ties, and privileges depends upon the trust instrument.

The delicate position in which a trustee, therefore, is placed by the trust deed, in and by which he is required and obligated to act in a dual capacity, also becomes clear, and in the execution of his obligations and powers under the law it is incumbent upon him to use the utmost good faith towards all parties in interest. He must act impartially for every person who has any rights in the estate. 2 Perry, Trusts, § 602o.

In vain do we search through the provisions of these trust deeds to find any authority vested in the trustee to enter into any lease with a tenant or tenants of the building, or to ratify or confirm any lease, or to consent to any lease, either orally or in writing, before conditions broken.

It is true that upon conditions broken on the part of the mortgagor an entirely different situation arises. Under the terms of the trust deed the mortgagor is then authorized to enter into and upon the mortgaged premises, take possession of the same, manage and control the same, recognize, make, or alter leases, or to enter into any agreements within the purview of the trust deed the situation may demand.

While it is a fact that under the provisions of the first paragraph of the trust deed proper the mortgagor conveys and assigns to the trustee, etc., all its right, title, and interest in, to, and under said lease (meaning said ninety-nine-year lease) and to any and all future income, rents, and revenue from the lease and leased property and any part thereof, such assignment and transfer is intended to be made effective only in the event of conditions broken, for a subsequent provision of the lease expressly provides that until default shall be made and continued by the mortgagor in the payment of the principal and interest of any of the bonds secured by the trust deed, or until default shall be made and continued in respect to some act, thing, obligation, or agreement required to be done, performed, or kept by the mortgagor as in said lease provided, the mortgagor shall be permitted to possess, manage, use, and enjoy the said mort-

gaged property and the improvements, appurtenances, rights, and privileges, and to take and use the incomes, revenues, rents, and profits thereof, as if the mortgage had not been made. Furthermore, it must be conceded that the trust deed does not in express terms, before conditions broken, authorize the trustee to lease any of the property covered by the ninety-nine-year lease, or the buildings thereon, or to accept or demand an assignment of the ninety-nine-year lease, or of any of the subleases, or of the rents, issues, and profits derived from any of said leases, excepting only in so far as he is authorized to act in order to prevent a forfeiture of the ninety-nine-year lease pursuant to conditions broken by the mortgagor of the terms of said lease.

We now come to the lease executed by the *Real Estate Company* to the *Theater Company*. This lease contemplated structural changes in the building of the *Real Estate Company*. The walls of the building were to be removed, ceilings raised, floors lowered, entrances changed, and other material and structural changes were contemplated. It was therefore an act of wise precaution on the part of the representatives of the *Theater Company* to confer with the trustee in order to fully present to him the plans in detail with respect to such contemplated changes. Such conferences were held, and, it appearing to the satisfaction of the trustee that such changes would not be detrimental to the interests of the bondholders, he expressed his satisfaction with respect thereto. The terms of the proposed lease were also submitted to the trustee, and he examined the same and found no objections thereto, and expressed his satisfaction therewith. The bondholders were vitally interested in having no changes made in the building of a structural nature that would endanger the stability of the building, for had the building been endangered by reason of such changes the same would have constituted waste and would have vitally and materially affected the interests of bondholders. Every effort was made on the part of the representatives of the

*Theater Company* to obtain the written consent of the trustee to this new lease with the *Theater Company*. Such consent was refused, indicative strongly of the position which is made apparent on the part of the trustee that he did not intend to bind himself as trustee, or the interests of the bondholders, to said lease. In fact, it is difficult to conceive of any situation or circumstance which would make the trustee's position as he made it manifest, clearer than was done by his refusal to either join in the lease or to give his written approval or consent to the document. Had he done so, he would nevertheless have failed to bind the interests of the bondholders, for the reason that his authority vests almost exclusively in the provisions of the trust deed, and, no such authority having been granted or vested in him, the interests of the bondholders could not have been bound.

A careful examination of the lease with the *Theater Company* will disclose the fact that it contains no provision whatsoever intended to bind the bondholders or even the trustee. It must also be borne in mind that at the time of the execution of the lease with the *Theater Company* there had been no default by the mortgagor of the conditions of the mortgages and that the *Real Estate Company* was in possession of the premises.

The evidence does not disclose, nor has the claim been made, that any of the bondholders at any time had any knowledge whatsoever of the proposed execution of said *Theater Company* lease; nor is there any evidence or claim that such bondholders were notified thereof subsequently, so as to lay the possible foundation on the part of such bondholders to a ratification or confirmation of such lease. True, the trustee, upon the execution of the lease with the *Theater Company*, received a large amount of money, aggregating about $15,000, which amount he disbursed to contractors and others engaged in the making of the necessary changes in the building to accommodate the theater. In making

these disbursements the trustee acted primarily in the interests of the mortgagor, as is made evident by the fact that the object and purpose of placing this money in the trustee's hands for disbursement was to provent the filing of liens and the incumbering of the mortgagor's interests. The mortgagee's interest could not have been affected by the filing of contractors', materialmen's, or laborers' liens. A bond was also executed to protect persons on the premises from personal injury during the construction of the theater and to also protect occupants of the theater. The execution of this bond was suggested by the trustee and was solely for the benefit of the mortgagor and of the *Theater Company.* So that it must have appeared to the bondholders, at the time of the execution of the *Theater Company* lease, that the property was in the possession of the *Real Estate Company.* The bondholders had no notice of the lease or of any changes with respect to the collection of the rents and of the proposed alterations in the building. There is nothing in the situation which justified any alarm on the part of the bondholders. Every one is familiar with the floating of bond issues of the nature of the one in question. These bonds are sold to numerous persons, who look for their security to the mortgaged property. Bondholders as a rule do not interest themselves in the collection of rents, and first become apprehensive when a default occurs in the payment of principal or interest. So that it is readily deducible from the foregoing:

1. That no authority was vested in the trustee to subject the interests of the bondholders to the *Theater Company* lease.

2. That the bondholders had no knowledge of the changes in the building designed to accommodate the *Theater Company.*

3. That the bondholders had no knowledge of the assignment of the rentals of the Berlin Arcade Building.

4. That they did not ratify or confirm said lease so as to subject their security to said lease.

So that the findings of the circuit court, wherein it substantially found that the matters and things the trustee did with respect to the lease of the *Theater Company* were not done for the purpose of jeopardizing the lien of the bondholders, and that the lease of the *Theater Company* did not become a prior lien to the lien of the bondholders, are well sustained by the evidence and by all the surrounding facts and circumstances in the case.

It is claimed by counsel for the *Theater Company* that under the rule as laid down in 16 Ruling Case Law, p. 599, § 77, and cited in Jones, Mortgages (5th ed.) § 782: "Though the general rule is that a subsequent lessee of mortgaged property, taking under a lease from the mortgagor, takes subject to the mortgage, yet where the mortgage, in express terms or by clear implication, authorized the mortgagor to make leases for the benefit of the mortgagee, a lease made in pursuance of such authority is binding on the mortgagee and those claiming under him," the lease to the *Theater Company* was such a lease as was contemplated by the parties to the trust deed to be made by the mortgagor for the benefit of the mortgagee, and is therefore binding upon the mortgagee, and subjects his security to the prior rights of the lease.

The doctrine as above stated, and contained in Ruling Case Law and in Jones on Mortgages, is founded principally upon the decision in the case of *Sammons v. Kearney P. & I. Co.* 77 Neb. 580, 110 N. W. 308, 8 L. R. A. N. S. 404.

A careful examination of the facts in the *Sammons Case* will reveal a radical distinction or difference between that case and the instant case. In the *Sammons Case* the plaintiff appealed from a decree of the lower court in an action brought to foreclose a mortgage, by which decree the plaintiff's mortgage lien was made subject to a certain lease or contract executed by the mortgagor to the defendant, North-

western Electric Heat & Power Company.    It appears that the general nature of the business of the defendant Kearney Power & Irrigation Company is the owning, constructing, and operating of canals, reservoirs, dams, and other works for irrigation and water-power purposes, including the power to lease its own property and to acquire by purchase such canals, reservoirs, and other works for irrigation and water-power purposes, including the power to execute mortgages or deeds of trust to secure such bonds as may or shall be issued by the company in furtherance of the objects of its incorporation.    On the 15th day of July, 1898, the defendant Kearney Company executed and delivered to a trustee a mortgage on certain of its property and rights to secure a bond issue of $150,000 in bonds of $500 each.    On the 1st day of November, 1899, the mortgagor entered into a contract in writing with the Northwestern Electric Heat & Power Company, whereby, for a consideration therein named, the latter was given the right to take water from the canal in question for a period of fifteen years, with the privilege of a renewal of the contract on the same terms for an additional fifteen years, for the purpose of furnishing power for its electrical machinery.    Default was made in the payment of the interest on the bonds, and on the 9th day of September, 1903, Sammons, who was the owner and holder of 239 of the 274 bonds disposed of, brought an action to foreclose the mortgage.    The Northwestern Electric Heat & Power Company was permitted to intervene and settle its rights under the contract with the defendant Kearney Power & Irrigation Company, the mortgagor.    The court found in favor of the plaintiff and ordered a decree that the property should be sold subject to the rights of the intervener, Northwestern Electric Heat & Power Company, under its contract with the mortgagor, and that such contract should be binding upon the purchaser at such sale. From this decree of the lower court, ordering a sale of the mortgaged property subject to the contract of the North-

western Electric Heat & Power Company, the plaintiff Sammons appealed.    On the appeal the principal question to be determined was: Did the court err in providing in the decree that the sale thereunder should be subject to the rights of the intervening company under its contract with the mortgagor? The court in its opinion first recites the general rule as heretofore stated, and then proceeds as follows:

"The foregoing rule is easily recognizable, as it is grounded on the general rule applicable to all mortgages that an interest subsequently acquired by a third party in the mortgaged property is subject to the mortgage; but the question is whether the facts in this case bring it within that rule."

In substance, the mortgage in the *Sammons Case,* among other things, covered, first, all the property of the mortgagor of every character; second, it was intended to cover not only such things in action, contracts, leases, claims, and demands as existed when the mortgage was given, but all such as the mortgagor might thereafter acquire; third, it also provided that all the things in action, contracts, leases, claims, and demands as the mortgagor might subsequently acquire, should be duly assigned to the mortgagee as further security for the mortgage debt.

In construing the trust deed and the contract above specified, the court in its opinion in the *Sammons Case* further said:

"But, when the construction of a contract becomes necessary, it is permissible to look beyond the language of the contract, and to take into account the nature of the subject matter, the condition and situation of the parties, and the facts and circumstances surrounding the transaction.    The mortgagor was a corporation, and one of the purposes of its organization was to lease water rights.    It was the owner of a plant, designed to serve that purpose, but which, as the record shows, yielded no revenue save such as might be derived from the sale or leasing of water rights.    The bonds, by their terms, were made to run for a period of twenty

years, and the interest thereon is payable semi-annually. Now, taking into account these facts and circumstances in connection with those provisions of the mortgage herein-before set out, it is too clear to admit of argument that the parties to the mortgage at the time it was made, contem-plated that the mortgagor's plant covered by the mortgage should be maintained as a going concern, because in no other way could it meet the interest on the bonds from time to time, to say nothing of the discharge of the principal debt when it became due."

The opinion further proceeds with the idea that at the time when these water rights were leased it was contem-plated by the parties that the lessee would necessarily be obligated to expend a large amount of money in improve-ments for its business, and that the trust deed or mortgage contained a provision that, upon default of the mortgagor, the mortgagee could declare the whole amount of the bonds and interest due and payable and immediately commence foreclosure proceedings, and thus deprive the lessee of his investment, unless it be held that the mortgage when orig-inally made contemplated the execution of these contracts and leases for the benefit of the mortgagee.

In the case at bar the trust deed was executed to run for a period of five years. It was contemplated at the time of the execution of such trust deed that at the end of this period there would be a refunding of the mortgage debt; so that it could not have been contemplated that during such period of five years the principal of the mortgage debt would be paid out of the rentals or profits of the building.

The five-year period of the trust deed in the instant case constituted an unusually short term for a bond issue of that kind, and was no longer than the usual period for which mortgages in considerably smaller amounts are executed. The very fact that the bond issue covered so short a period of time, in itself was indicative of the fact that the parties at the time of the execution thereof did not contemplate

subjecting this bond issue to the provisions of a long-term lease such as the *Theater Company* lease.

Furthermore, there is no provision contained in the trust deed or mortgage in the instant case whereby all the profits and rents derived from the leased property are to be paid and assigned to the mortgagee for his benefit. Under the trust deed in the instant case the mortgagor, until conditions broken, was to continue in the uninterrupted possession of the leased premises and enjoy the rents, issues, and profits thereof. On the other hand, in the *Sammons Case* all the property of the lessee or contractee, including leases, contracts, rentals, profits, etc., of every nature and description, was assigned and transferred to the mortgagee, and it does not appear, as far as the reading of the opinion in the case is concerned, that the mortgagor in the *Sammons Case* was entitled to possession and enjoyment of the mortgaged property, and of the rents, issues, and profits thereof, until conditions broken. Furthermore, in the *Sammons Case* the leases and the trust deed, respectively, covered terms which would expire at or about the same time, strongly indicative of an intention on the part of the parties to make the mortgage subject to the provisions of such lease. It is also clearly inferable from the provisions of the Sammons trust deed and lease or contract that it was contemplated by the parties that the principal amount of the trust deed would, during the period thereof, be fully paid by the rentals, issues, and profits derived from the lessees and others of the mortgaged property.

It also appears clearly that in the *Sammons Case,* where valuable water rights were leased, it was contemplated, in order to make use of the provisions of such lease, that the expenditure of a large sum of money would be necessary on the part of the lessee in order to obtain the full advantage of the leased rights. And above all things it appears from the *Sammons Case,* and is so stated in express language, that the facts and circumstances in connection with the pro-

visions named in the trust deed or mortgage are such that by necessary implication the parties to the mortgage at the time it was made contemplated that the mortgagor's plant covered by the mortgage should be maintained as a going concern for the benefit of the mortgagee.

It was not claimed in the *Sammons Case* that the mortgage gave express authority to the mortgagor to make the contract or lease under which the intervening company claimed superior rights to that of the mortgagor, but it was claimed that such rights followed from the terms of the trust deed or mortgage by necessary implication. And the court very rightly said in its decision in the *Sammons Case* that the solution of the question is to be found in the familiar rules of construction applicable to the facts in that case, rather than in precedents, resting as they must on instruments differing materially from that under consideration.

It is contended on the part of counsel for the *Theater Company* that injustice may be done to their client resulting from the investment of a large sum of money in the reconstruction of the building in order to accommodate the theater, which money to a large extent, under the decree as entered by the lower court, would constitute a loss. That fact is to be regretted, and it is also to be regretted that the proper officers of the *Theater Company* and of the *Real Estate Company* did not see fit to enter into an agreement wherein and whereby it would be stipulated that the mortgaged property was to be sold and bids invited, so that title might be conveyed either free from the lease or subject to the lease, in accordance with the bids received upon such sale. It is not too late now to enter into such a stipulation, and it would appear to us that the interests of all parties would be subserved thereby. However much we may sympathize with the *Theater Company* in its present deplorable condition, we nevertheless must also take into consideration the status of the bondholders and the rights which they contemplated at the time of the purchase of the bonds. Their

interests were first in point of time.    It was always within
the power and the province of the *Theater Company* and its
officers to make a careful study and examination of the trust
deeds in question and thereby reasonably satisfy themselves
as to their rights thereunder.    Such examination, from
the evidence, has apparently been made by counsel for the
*Theater Company*.    Realizing the situation, the *Theater
Company* saw fit to proceed with the expenditure of a large
sum of money, notwithstanding the open and direct refusal
of the trustee to join in the *Theater Company* lease or to
approve of the same in writing, which is not at all decisive
upon the legal aspect of this case, but very persuasive, and
almost conclusively decisive, of the fact in this case that the
*Theater Company* and its officers concluded to take their
chances of the mortgagor avoiding a default and thus se-
curing to themselves the benefits of the full term of the
*Theater Company* lease.

We are therefore of the opinion that the doctrine of the
*Sammons Case,* and as cited by Jones on Mortgages and in
Ruling Case Law, has no application to the case at bar.

In view of what has been said, it is unnecessary to take
up and treat further the claim made by the attorneys for
the *Theater Company* under which it is contended that the
plaintiff is estopped from insisting upon the priority of the
trust deed or mortgage over the lease.    The real party in
interest is not the trustee but the bondholders.    The latter
had no knowledge of the *Theater Company* lease or of the
changes made to accommodate the *Theater Company,* and,
the trustee not having authority in the premises, the bond-
holders cannot be held as bound and cannot be deemed
estopped.

By all the authorities we have been able to find, pertinent
to the subject, it is held that, in order to authorize the trustee
to subject the trust deed to a lease subsequently made, the
right must be contained in the provisions of the trust deed
either by express language or by necessary implication, and,

such language not being contained in the trust deed in question, the result follows that the trust deed in question is not subject to the lease. Other authorities confirming this position are *Sands v. Kaukauna W. P. Co.* 115 Wis. 229, 91 N. W. 679; *Haven v. Adams,* 4 Allen (86 Mass.) 80; *Ellis v. Boston, H. & E. R. Co.* 107 Mass. 1.

It is further contended by the *Theater Company* that the mortgagor assigning the rents to the mortgagee, and both the mortgagor and mortgagee notifying the tenant of such assignment, and the tenant paying the total rents accruing under the lease to the mortgagee, as disclosed by the uncontradicted evidence, was an attornment and established the relation of landlord and tenant between the mortgagee and the tenant.

The law of attornment does not apply as between the tenant of a mortgagor and the mortgagee in states where the legal title of the mortgaged premises does not pass to the mortgagee. The status of the mortgagor and mortgagee with respect to mortgages and trust deeds has heretofore been fully set forth, under authorities cited.

The doctrine is stated in 2 Jones, Mortgages (7th ed.) § 778:

*Attornment ineffective where mortgage is mere lien.* "But in a state where a mortgage is regarded as conveying no title to the mortgagee, and the right of possession until foreclosure and sale is assured to the mortgagor by statute, it has been held there is nothing to rest an attornment upon and that the doctrine has no application. The verbal agreement of a tenant to pay rent to the mortgagee does not continue the existing tenancy, simply putting the mortgagee in place of the mortgagor as landlord; but it is a new undertaking and must be valid as a new agreement if valid at all. In such states a mortgage by the lessor does not carry the reversion in the leased premises so as to entitle the mortgagee to recover rents; though the mortgagee may, of course, secure the right to the rents by an assignment contained in the mortgage. In such states, the tenant cannot repudiate his tenancy under the mortgagor and acknowledge a tenancy

under the mortgagee, until after the mortgage has been foreclosed and the period of redemption has expired."

In a Michigan case (*Hogsett v. Ellis,* 17 Mich. 351) it is said:

"If it be said that, though the mortgage does not give the mortgagee the right to possession against the will of the mortgagor, yet, by the consent of the mortgagor and the tenant, he may be let into possession, and thus acquire the right to rent; so, I reply, may any other person not holding a mortgage acquire, in the same way, the right to possession, and the right to rent, by any valid agreement to that effect. But, in both cases alike, I think it would depend upon the contract *as such,* which might be made between them, and not upon the doctrine of attornment."

In connection with this doctrine of attornment we must reiterate what has been repeatedly heretofore said, that neither under the express terms of the trust deed or mortgage, nor by necessary implication, did the trustee have the right or authority to do anything before conditions broken that would jeopardize the interests of the bondholders with respect to the lien acquired at the time of the execution of the trust deed.

As to the status of the *Theater Company* and the mortgagee after conditions broken, and after entry on the part of the mortgagee, a different situation exists.

It is said in *Gartside v. Outley,* 58 Ill. 210, 214, 215:

"It is in the power of the mortgagee, on entry for conditions broken, where the property has been leased subsequent to the making of a mortgage, to treat the tenant as a trespasser and bring ejectment, even without notice, or the mortgagee may elect to recognize the lessee as his tenant. The authorities all agree in holding, where the mortgagee has entered for conditions broken, or received rents of the tenant, that the relation of landlord and tenant will be created between the parties. . . . The question of the time for which it will be considered that the tenancy is created by the fact that the mortgagee received rents of the lessee, whether for the entire period of the unexpired lease, or for only a shorter period, is a question of more difficulty of

solution.   The generally received doctrine seems to be that the receipt of rents by the mortgagee will only create a tenancy from year to year, in analogy to the rule where the tenant holds over after the expiration of the lease.   The doctrine proceeds upon the ground that the lease is inoperative as to the mortgagee, and is terminated by the act of entry.   The rule of the common law is well established, that the mortgagor cannot, without the consent of the mortgagee, execute a lease that will prevail against the rights of the mortgagee, and it has been uniformly held that the entry of a mortgagee puts an end to the lease.   *Keech v. Hall,* 1 Doug. 2.   Upon principle, therefore, something more is required than the mere receipt of rents from the lessee, to make valid the lease for the unexpired term as against the mortgagee.   In *Doe ex dem. Hughes v. Buckner,* 8 Carr. & Payne, 566, PATTERSON, J., held that if the mortgagee instead of turning out the lessee elects to take him as his tenant, the mortgagee does not thereby set up the tenancy for the entire unexpired term of the lease, but only from year to year.   The case of *Thunder v. Belcher,* 3 East, 449, holds the same doctrine, that the receipt of rents will only create a tenancy from year to year, as between the lessee and the mortgagee.   We find that these cases have been quoted by numerous text-writers and the doctrine established does not seem to be questioned.   Hilliard, Mortgages, p. 235, § 231; Taylor, Landl. & T. § 120; Platt, Leases, p. 171."

While the doctrine as set forth in the *Gartside Case, supra,* undoubtedly is the accepted doctrine of the authorities on the subject, under that very doctrine it would appear to us that when in the year 1916 the trustee, after conditions broken, took possession of the mortgaged property and collected the rents, issues, and profits thereof, including the rents from the *Theater Company,* and immediately followed such acts by a foreclosure proceeding in the instant case, that he thereby made manifest his intention of not treating the *Theater Company* as a trespasser, but of treating it as his new tenant under a lease to expire upon the sale of the property under foreclosure proceedings.

Having covered all of the various points made in the brief

of counsel for the *Theater Company* and having arrived at a conclusion adverse to the contentions of such company, we will now take up the consideration and determination of question No. 2, above set forth.

It is contended by the trustee for the second-mortgage bondholders and by the individual bondholders, defendants herein, and by the *Real Estate Company* and its receiver, that, among other things, the trustee retained over $22,500 out of the proceeds derived from the sale of the bonds secured by the first trust deed or mortgage for his own individual purpose and for other purposes foreign to the provisions of such trust deed or mortgage, under and pursuant to which such proceeds were to be used solely in the erection and construction of the building; that he also converted to his own use, or wrongfully disbursed and expended, a large sum of money derived as interest on the first-mortgage bonds and by way of rentals and income from the tenants in the Arcade Building (and that he otherwise violated his trust in other particulars, with respect to which it is not necessary at this time to go into detail) in the administration of his trust, all to the great damage of such defendants, on account of which such defendants have in the course of the trial demanded that said *Schroeder* be impleaded individually in order to enable such defendants to compel him to account for such maladministration personally, etc., and an offer of proof was made by such defendants in order to substantiate such allegations.

With respect to the issues raised by such defendants, among other things the court found, in addition to the findings already hereinbefore set forth, as follows:

That *Schroeder*, acting as trustee under both the first and second mortgages, purchased the mortgaged premises at tax sales for the years 1915 and 1916 for the city and county taxes, and out of the rents collected, after taking possession as trustee, repaid himself for redemption moneys.

That plaintiff entered into the possession of the mort-gaged premises as trustee, with the mortgagor's consent, on October 11, 1916 (which was the day of the commencement of this action).

That *Schroeder,* as trustee, had advanced for the benefit of said mortgage bondholders various interest payments aggregating $23,000, and is entitled to be subrogated in that sum.

That $4,000 is a reasonable solicitors' fee to be paid to the plaintiff's attorneys.

The court also in such findings allowed the plaintiff, as trustee, for the collection of the rents an amount equal to three per cent. as stipulated in the mortgage, and also allowed him an additional fee as trustee in renting, making repairs, managing, and otherwise caring for the mortgaged premises and property and for performing other duties devolving upon him as trustee, and found such sums as reasonable.

As conclusions of law the court found that the counter-claims of the defendants *Real Estate Company* and *Benjamin Leafgreen,* the counterclaim of the defendant *Esbenshade* as executrix, the counterclaim of the defendant *Hummel,* and the counterclaim of the defendant *Leidig* as trustee, should be dismissed; and judgment pursuant to such findings was thereupon duly entered and docketed.

*Schroeder,* as trustee, was the plaintiff in the action. As an individual he was not a party, and in law could not be considered a party unless he was impleaded in his individual capacity. The mere fact that he was a party in a representative capacity does not authorize proceedings against him in an individual capacity unless he is first joined as an individual. In other words, in contemplation of the law *Schroeder* as an individual and *Schroeder* in a representative capacity are deemed two distinct entities.

"A bill cannot unite distinct demands against the same defendant, where his liability upon one is individual and upon the other is in a representative capacity; but the rule

is confined to the presentation of distinct demands and does not extend to cases where defendant is otherwise a proper party in both capacities." 16 Cyc. 255.

So that we must conclude that *Schroeder* as an individual was not before the court.

Of course the rule is well recognized that a failure to use reasonable diligence or an abuse of his discretionary powers renders a trustee under a trust deed personally liable to the party injured for the damages done. Jones, Mortgages, § 1771.

As already stated, the application to implead *Schroeder* individually was not made to the lower court until after the trial of the issues had proceeded for a period of about two weeks. It must not be understood that it is our opinion that *Schroeder* as an individual would not have been a proper party; on the contrary, it is our opinion that had the court seen fit, even at that stage of the trial, to suspend the trial for the purpose of impleading *Schroeder* and of thus enabling an accounting and a final adjudication of the issues presented by the defendants, it would have exercised a proper and a wise discretion, in view of the provisions of secs. 2610 and 2656*a*, Stats., which are intended to give the trial court very broad powers, not only in the calling in of parties but in the molding and adapting of the pleadings so as to finally dispose of all branches of the controversy. *Swanby v. Northern State Bank,* 150 Wis. 572, 577, 137 N. W. 763; *Doherty v. Doherty,* 131 Wis. 375, 111 N. W. 478; *Carney v. Gleissner,* 62 Wis. 493, 22 N. W. 735.

Sec. 2610, Stats., among other things provides that

"A defendant who shows by affidavit that if he be held liable in the action, he will have a right of action against a third person not a party to the action for the amount of the recovery against him, may, upon due notice to such person and to the opposing party, apply to the court for an order making such third person a party defendant, in order that the rights of all parties may be finally settled in one action, and the court may in its discretion make such order."

Sec. 2656a, among other things, provides:

"A defendant . . . may have affirmative relief against a codefendant, or a codefendant and the plaintiff, or part of the plaintiffs, or a codefendant and a person not a party, or against such person alone, upon his being brought in; but in all such cases such relief must involve or in some manner affect the contract, transaction or property which is the subject matter of the action."

Attention is called to the fact that in and by that portion of sec. 2610 quoted the interpleader is made discretionary with the court.

The portions of the sections above referred to have been repeatedly construed by this court and the right to interplead has been held discretionary. *Ertel v. Milwaukee E. R. & L. Co.* 164 Wis. 380, 384, 385, 160 N. W. 263; *Kresge v. Maryland C. Co.* 154 Wis. 627, 631, 143 N. W. 668; *Schmuhl v. Milwaukee E. R. & L. Co.* 156 Wis. 585, 586, 146 N. W. 787; *Hemenway v. Beecher,* 139 Wis. 399, 402, 121 N. W. 150; *Swanby v. Northern State Bank,* 150 Wis. 572, 137 N. W. 763.

Furthermore, it has been repeatedly decided by this court that an order denying a motion to bring in a person who may be a proper but is not a necessary party is not appealable. *Reinhart v. Fire Asso.* 93 Wis. 452, 67 N. W. 701; *Cook v. Menasha,* 95 Wis. 215, 70 N. W. 289; *Wechselberg v. Michleson,* 105 Wis. 452, 81 N. W. 657; *State v. Wis. T. Co.* 134 Wis. 335, 341, 113 N. W. 944; *Schmuhl v. Milwaukee E. R. & L. Co.* 156 Wis. 585, 146 N. W. 787.

So that, with respect to said question No. 2, we answer, first, that, inasmuch as it was discretionary with the court to have either impleaded or denied the impleading of *Edward Schroeder* individually, in refusing to permit *Schroeder* to be impleaded the court acted within its rights and exercised its discretion; and secondly, that, the court having exercised its discretionary rights, an appeal from the ruling of the court does not lie.

It is contended by counsel for the *Real Estate Company* and for *Leafgreen* that the foreclosure action was prematurely brought for four reasons, namely:

a. Because no meeting of the bondholders declaring a default and directing the trustee to enter and foreclose the mortgage was ever held.

b. Because no six months' notice in writing of the alleged default under the ninety-nine-year lease was given.

c. Because no six months' notice was given of the intention to declare the whole amount due for nonpayment of interest or any other alleged violation of the terms in either one of the trust deeds.

d. Because there was in fact no interest due and unpaid at the time the foreclosure was begun.

We will first take up the contention under paragraphs a, b, and c.

Article 6 of the trust deed provides:

"In case such default shall be made in the payment of any interest on any of the bonds issued hereunder and shall continue for the period of six months after payment of such interest shall have been duly demanded in writing, or in case default shall be made in the payment of the principal of any of such bonds when the same shall become due or be declared due and payable as in this mortgage provided, or in case default shall be made in the performance of any other agreement or stipulation herein or in said lease contained on the part of the mortgagor and lessee, or either of them to be kept and performed, then and in either or any or every such case it shall be lawful for the trustee, and upon a requisition in writing signed by the holders of not less than one third in amount of the bonds then outstanding, and adequate indemnity against all costs, expenses and liabilities to be by him incurred, it shall be the duty of the trustee to proceed to enforce the rights and liens of the bondholders under this mortgage, either by the foreclosure," etc.

It will thus be seen from the portion of article 6 above quoted that for a default in the payment of interest upon the bonds it is necessary that the same shall continue for

a period of six months after a payment shall have been duly demanded in writing before the trustee can commence any action to foreclose the mortgage on that account. However, it is clear from the subsequent provisions of said article 6 that where default shall be made in the payment of principal, or in case default shall be made in the performance of any other agreement or stipulation, which would include a default pursuant to failure to pay taxes on the property, the trustee is authorized to proceed with the foreclosure of the mortgage; and the subsequent provision of said article 6, above referred to, makes this clear, because it provides in express terms that "upon a requisition in writing, signed by the bondholders, . . . and upon adequate indemnity having been given," etc., it shall be the duty of the trustee to proceed with foreclosure or some other remedy provided for in the trust deed.

It is clear, therefore, that said article 6 first on the given default extends and grants the right to the trustee to foreclose of his own motion, if he so desires, and becomes compulsory upon the requisition of the bondholders and the furnishing of security as is so provided in said trust deed.

Article 4 of the trust deed provides:

" . . . or in case the mortgagor . . . shall fail to observe, keep, or perform any condition of said lease, then and thereupon the principal of all bonds secured by this mortgage shall at the election of the trustee immediately become due and payable. Provided that a majority in interest of the holders of all such bonds issued hereunder and then outstanding may in writing or by a vote of such majority at a meeting duly held as herein provided, at any time after such default or failure, declare, or instruct the trustee in such case to declare, that upon the expiration of said period after such default and demand, or immediately after such failure to insure, the said principal shall become immediately due and payable as aforesaid, and the same shall thereupon become immediately due and payable; or such majority may, in like manner, waive or instruct the trustee to refrain from making such election and declaration on such terms and

conditions as such majority may deem proper, and may annul or reverse the previous election made or action taken by the trustee in that behalf, whereupon said principal sum shall immediately cease to be due and payable."

Under and pursuant to said article 4 of the trust deed, therefore, the trustee had authority, upon failure of the mortgagor to observe or keep or perform the conditions of said lease, among which was the obligation to pay taxes, to elect to and to declare the whole amount of the principal of said bonds due. However, the bondholders at all times retained the right to waive such default and to insist that the trustee refrain from making such election and declaration of default.

The notice of election of the trustee to declare the whole amount of the first-mortgage bonds due assigned as reasons the failure to keep the covenants and conditions of the ninety-nine-year lease requiring the payment of taxes, and the default on the part of the mortgagor in the payment of the taxes for the years 1914 and 1915. So that it is apparent that said trust deed gave the right to the trustee to declare the first-mortgage bond indebtedness due for breaches of the terms of the ninety-nine-year lease without a meeting of the bondholders as a condition precedent.

It is true that there is a provision in the ninety-nine-year lease that any successor in interest of the lessee must be given notice by the lessor, in writing, of the fact that he has not performed the covenants of the lease and that such successor in interest has six months after such notice in writing in which to perform. No such notice was ever given, and the notice given by the trustee on October 2, 1916, being the notice of default for payment of taxes, etc., is the only notice that was given with respect to any failure on the part of the mortgagor. This notice last referred to is a notice expressly designed to be for the benefit of the lessee under the ninety-nine-year lease, being the mortgagor under the trust deed, and is contemplated to be given and can be given

only by the lessor.   Such provision in the ninety-nine-year lease inures to the benefit of the lessee, or mortgagor under the trust deed, and prevents any action on the part of the lessor in the form of proceedings to forfeit the ninety-nine-year lease on account of such conditions broken on the part of the lessee during the six months' period.

Inasmuch, however, as a failure to pay the taxes under the ninety-nine-year lease was expressly made a default, upon the happening of which, under the provisions of the trust deed, the trustee was authorized to proceed by election to declare the whole amount of the principal of the bonds due by foreclosure, the trustee was fully authorized to proceed with his declaration and foreclosure, notwithstanding the aforesaid provision in the ninety-nine-year lease.

It is also claimed that there was in fact no interest due and unpaid at the time the foreclosure was begun, and it is claimed that every interest coupon that had matured before foreclosure had been discharged and paid by *Schroeder*. The evidence, however, shows that *Schroeder* had advanced the interest to the bondholders and held the coupons as security for the advancements, and that he is entitled to be subrogated to the rights of the coupon holders, and the court so found.

The evidence also shows that *Schroeder* held these coupons and that they were not marked "canceled," and *Schroeder's* books as trustee do not show the payment of the interest on the coupons.   The evidence also shows that *Schroeder* kept two accounts with the *Berlin Arcade Company,* one an account of moneys advanced on its account by him personally, and another account which shows his receipts and expenditures as trustee, entered on the books as *"Edward Schroeder,* special," and that from time to time, when there were moneys received as income from the mortgaged premises, it would be transferred from the *Edward Schroeder,* special, account in part payment of the indebtedness shown in the personal account of *Schroeder.*

It also appears that *Schroeder* had in this way advanced for the benefit of the *Real Estate Company* an amount to be paid to the bondholders for interest on the bonds in the sum of $23,000, as the result whereof foreclosure on the trust deed was delayed for a period of two years.

It would be inequitable and unjust under the circumstances, therefore, not to subrogate *Schroeder* for the payments so made to the interests of the bondholders under these coupons, and we hold that the circuit court in so doing should be sustained.

It is further contended by counsel for *Leafgreen* and the *Real Estate Company* that the current income up to the time of the foreclosure was in a sum greater than the amount necessary to discharge all previously maturing interest payments. *Schroeder's* books, having been introduced in evidence, clearly controvert this claim and show that the mortgagor, the *Real Estate Company,* was always indebted to the plaintiff, and that the advancements of *Schroeder* for the benefit of the mortgagee up to the time of the trial amounted to the sum of $24,875.

On April 15, 1914, the defendant *Leafgreen,* then owning substantially all the capital stock of the mortgagor, and the plaintiff, *Schroeder,* made an agreement in writing which among other things recited and provided the following:

First, the execution of the first trust mortgage and the fact that $125,000 of the first-mortgage bonds were all outstanding; second, the indebtedness of the mortgagor to *Schroeder* for insurance premiums, for $1,243.04; third, the holding by *Schroeder* of past-due interest coupons from first-mortgage bonds, aggregating $5,400.94, plus interest; fourth, the default by the mortgagor in the payment of the 1912 and 1913 taxes; and fifth, the accruing of additional interest on the mortgage and quarterly rent payable by the mortgagor under the ninety-nine-year lease on May 1, 1914.

It was therefore agreed that, in order to raise the above moneys then due and in the future accruing and to secure

*Schroeder* moneys owing him, the mortgagor pay to *Schroeder* $4,500 in cash, to be 'applied:

(a) In payment of semi-annual interest on first-mortgage bond coupons maturing May 1, 1914.

(b) In payment on account of taxes and assessments for the year 1912.

(c) In payment of quarterly rent owing Maria Niemann (the lessor under the ninety-nine-year lease), on May 1, 1914.

"If above sum is insufficient, *Schroeder* to advance sufficient money to make up deficiency."

Then the agreement provides for an assignment to *Schroeder* of all rent moneys accruing from mortgaged premises, etc. The moneys collected by *Schroeder* were to be applied by him as follows:

1. Wages for janitor and elevator man and charwoman, not exceeding $115 monthly.

2. Semi-annual interest and quarterly rent becoming due May 1, 1914.

3. Taxes and assessments, general and special, due or to become due.

4. All subsequent instalments of interest on first mortgages.

5. Rent under ninety-nine-year lease and taxes and assessments.

"When items 1 to 4 are paid, any surplus to be applied to the payment of sum due *Schroeder,* as recited in the first whereas preamble above for expenditures for taxes and amounts due on past-due clipped coupons."

When the foregoing sums are paid the agreement was to terminate. *Schroeder* was not bound by any fixed order of payments, but could apply moneys as by him deemed advisable, excepting only that nothing should be paid on account of moneys due *Schroeder* personally until interest, rent, taxes, assessments, and wages had been paid.

The mortgagor also agreed to defray all costs and expenses to operate the building, except for moneys to be paid out of rentals as above recited, and that it would make up any deficiency on account of any or all the above obligations if the rentals and income were insufficient.

The foregoing agreement is set forth in the answer of the *Real Estate Company* and of the defendant *Leafgreen*. This agreement amounts to a clear confession on the part of the *Real Estate Company* and *Leafgreen,* its principal stockholder, that at the date of said agreement, namely, April 15, 1914, there was a large indebtedness of the mortgagor to *Schroeder;* that there was no property in the hands of said plaintiff out of which such indebtedness at that time could be paid; and absolutely precludes the idea that there were unexpended portions of the proceeds of the first-mortgage bonds available at that time out of and from which these various obligations could be paid.

It also appears that the $22,500 alleged to be the unexpended portions of the proceeds of the first-mortgage bonds had been paid out in liquidation of obligations created by the mortgagor before *Leafgreen* became a stockholder and officer of the *Real Estate Company,* and that the mortgagor and *Leafgreen* knew of these facts at the time of the execution of said agreement of date of April 15, 1914.

*Schroeder* testified that from April 15, 1914, to October 11, 1916, *Leafgreen* had an office in the Berlin Arcade Building and that *Schroeder* consulted him with respect to all of the expenditures, and that *Leafgreen* never made any objections with reference to the same. And it further appears, as the result of cross-examination of *Schroeder* on the trial by one of the defendants' counsel, that he testified that the whole proceeds of the sale of the first-mortgage bonds were paid out upon the written directions of the mortgagor. If that be true, and there is testimony to substantiate it, notwithstanding the provisions in the first trust deed or

mortgage, wherein and whereby the proceeds of the first-mortgage bonds were to be all expended in the erection and construction of the building, such provision was modified by the mortgagor and *Schroeder,* and they, being the only parties interested, had a perfect right to make such modification.

It also appears from the testimony in the case that after the execution of the trust deeds in question the mortgagor and *Leafgreen* made a contract for the construction of the building whereby *Leafgreen* obligated himself to furnish all the material and do all the work to finish and complete it for $151,000, of which *Leafgreen* received $102,000, proceeds of the first-mortgage bonds, $30,000 in second-mortgage bonds at face value, and $19,000 in notes of the *Real Estate Company.* Additional expenditures were made, making the total cost of the building the sum of $193,000; and *Leafgreen* testified that $172,657 went into the building and that he still had coming to him for extras the sum of $21,157.

From the foregoing it would also appear quite conclusively that the contract last above referred to not only made it possible to complete the building without applying all the proceeds of the first-mortgage bonds for that purpose, but this agreement is also strongly indicative of an understanding by and between the mortgagor and the plaintiff, and tends to prove, that the balance of the first-mortgage bonds not expended in the erection of the building was disposed of for the purpose of paying the various items which the testimony shows were paid and which constituted the sum of about $22,500.

Let us now consider what the status of the trustee under the second trust deed and second-mortgage bondholders is in this case.

With respect to the alleged illegal expenditures and appropriations of the proceeds of the first-mortgage bonds and of other alleged misappropriations, the first-mortgage bondholders are directly interested.

"In the foreclosure proceedings, the trustee represents the first-mortgage bondholders, and it has been held that such trustee may sue to foreclose the mortgage without joining the bondholders. And where a bill in equity is filed by the trustees for the foreclosure of a mortgage, the individual bondholders are not necessary, nor, as a rule, even proper parties to the suit." 2 Elliott, Railroads, § 508; *Central T. Co. v. Burton,* 74 Wis. 329, 336, 43 N. W. 141; sec. 2607, Stats.

Article 6 of the trust deed also provides: "No holder of any bond or coupon hereby secured shall have the right to institute suit, action, or proceeding, in equity or at law, for the foreclosure of this mortgage, or for the execution of any trusts thereof, or for the appointment of a receiver, or for any other remedy hereunder;" and further provides that such right shall vest exclusively in the trustee.

The first-mortgage bondholders, not having participated in a modification of the trust agreement with respect to the application of the proceeds of the first-mortgage bonds, would undoubtedly have had the right, upon a proper pleading in that regard, to have enforced an accounting on the part of the trustee for the alleged improper expenditure of the amount of the first-mortgage bonds. Evidently, however, the first-mortgage bondholders considered the security ample to protect them, and therefore no application was made by them or by any of them intended to effectuate such purpose. On the contrary, they have seen fit to rely solely upon the security of the first trust mortgage and the property covered thereby, and this was and is their undoubted privilege.

The second-mortgage bondholders were contented to and did accept a second mortgage upon the leasehold interest of the mortgagor and the buildings thereon, subject in all respects to the lien of the first mortgage. The obligation provided for in the first trust deed or mortgage, wherein and whereby it is agreed that the proceeds of the first-mortgage bonds shall be used exclusively for the erection and con-

struction of the contemplated building, constitutes an agreement between the mortgagor and the first-mortgage bondholders, and is a personal agreement with the first-mortgage bondholders which in no manner inures to the benefit of the second-mortgage bondholders, and does not constitute an agreement running with the land so as to enable the second-mortgage bondholders to take advantage of the same. This agreement between the mortgagor and the first-mortgage bondholders was not one made for the benefit of a third party, namely, the second-mortgage bondholders, and in order to entitle the second-mortgage bondholders to the benefit of such agreement there must be on the part of the original parties to the contract a clear intent to effectuate that purpose. 2 Elliott, Contracts, § 1413.

Such intent not being made manifest from the wording of the first trust deed, such provision in the first trust deed becomes a personal covenant, if anything, and does not inure to the benefit of the second-mortgage bondholders. *Hartung v. Witte,* 59 Wis. 285, 18 N. W. 175; 7 Ruling Case Law, p. 1112, § 29. Therefore it becomes evident that the second-mortgage bondholders must rely, first, upon the equity in the leasehold estate after the satisfaction of the claims of the first-mortgage bondholders; and secondly, they have the right, in the event of an amount being realized upon such sale which is inadequate and insufficient to pay the amounts due them in whole or in part, to obtain a deficiency judgment against the mortgagor, which amount they must collect either from the receiver of the mortgagor in the receivership proceedings, as a general creditor, or, in the event that such receivership proceedings be discontinued or not made effectual, to sequestrate, upon proper proceedings, all the property of the said mortgagor not sold or disposed of under the foreclosure proceedings.

It follows, therefore, from what has heretofore been said that the trustee under the second trust deed or mortgage and the second-mortgage bondholders, except as herein stated,

have no interest whatsoever in this foreclosure proceeding, and that their counterclaims for affirmative relief were properly denied and dismissed.

The *Real Estate Company* also has appeared in this action, filed an answer and cross-complaint, and in law is authorized to participate in the litigation. Any proceeds, however, derived from this litigation, over and above what is necessary to satisfy the claims of lienholders, belong to and are the property of the receiver. The direction of the litigation in behalf of the mortgagor, and the control thereof, therefore, rests in the receiver, and the policy and remedies pursued by him must necessarily govern.

The receiver interposed an answer in and by which he puts the plaintiff to his proofs, alleges that all the holders of the outstanding bonds are necessary parties to this action, and asks that the equities of the several parties to the mortgaged premises be ascertained so that the receiver may determine the amount necessary to redeem from the liens as so established. He further asks that only one judgment of foreclosure be entered, and expressly reserves the right to litigate in a separate action the issues in an action then pending in the circuit court for Milwaukee county, brought by the receiver against *Edward Schroeder* and others and designed to recover damages on account of misconduct on the part of the trustee and misappropriation of funds.

It having been found by the court below that the amount of the principal of the bonds on both the first and second mortgages is due, together with the interest and other items, such as taxes, etc., and there being ample evidence to sustain such finding of the lower court, and one judgment having been entered as prayed for by the plaintiff and the defendant *Leidig* and the receiver, the judgment of the lower court must be affirmed.

Counsel for *Leidig,* trustee, etc., also contends that he has the right to compel the plaintiff in this action, by the judgment of the court, to marshal and apply all of the assets

available to the trustee for the first-mortgage bondholders, and to compel the trustee to first satisfy as much of the claim of the first-mortgage bondholders out of such assets, other than the leasehold interest and the buildings thereon, as such assets will pay, before resorting to the mortgaged property; and he also claims the right of subrogation of the trustee for second-mortgage bondholders to the rights of the trustee for the first-mortgage bondholders with respect to such assets, exclusive of the mortgaged property.

The doctrine of marshaling of assets is an old equitable doctrine, well recognized in this and other states, and should be applied wherever available and where the same does not work hardship or inequity to the interests of the first-mortgage bondholders. As is said in 6 Pomeroy, Eq. Jur. (3d ed.) § 865:

"The equitable remedy of marshaling securities, with that of marshaling assets, depends upon the principle that a person having two funds to satisfy his demands shall not, by his election, disappoint a party having but one fund."

It appears from the testimony in this case that the plaintiff has but one property out of which to satisfy the claim of the mortgage bondholders, and that is the mortgaged property. The balance of the assets coming into the hands of the trustee have all been expended, either rightfully or wrongfully, so that in reality there is not more than one fund or one property out of which the plaintiff can satisfy his claim. What the mortgagor retains is a mere claim of cause of action.

Under these circumstances the doctrine of the marshaling of assets is not applicable, for the reason that the claim arising for misappropriation of the proceeds of the first-mortgage bonds and for misconduct of the trustee is one which may involve the trustee in litigation. A paramount creditor, such as the trustee in this case, cannot be compelled to exhaust in the first instance a mere personal remedy. 26

Cyc. 930, 931; *Palmer v. Snell,* 111 Ill. 161; *Wolf v. Smith,* 36 Iowa, 454; *Boone v. Clark,* 129 Ill. 466, 21 N. E. 850; *Walker v. Covar,* 2 S. C. 16.

Objection is also made by counsel for the second-mortgage bondholders and the receiver that the court erred in allowing *Schroeder* to reimburse himself for moneys advanced by him in the construction of a bowling alley. There is ample evidence in the case to prove that these expenditures were made upon the direction and under the supervision of *Leafgreen,* who was at that time the president of the *Real Estate Company* and the owner of practically all the stock of such company, and that it was understood and agreed between the mortgagor and *Schroeder* that *Schroeder* should be reimbursed for all moneys expended by him personally on that account.

A solicitor's fee of $4,000 was allowed to plaintiff's attorneys by the court. There is ample evidence to sustain the finding of the lower court that such allowance was reasonable. We appreciate the efforts and labor connected with this foreclosure and the trial of the action and the knowledge and experience requisite for that purpose.

The allowance made for the receiver is also reasonable, and the evidence fully warrants it.

There is no charge made in this case that there was collusion between *Schroeder,* the trustee, and the first-mortgage bondholders, and the purchase in good faith of the first-mortgage bonds by their holders, and the payment at par therefor, is unchallenged.

*By the Court.*—The judgment of the lower court is affirmed.

The following opinion was filed October 3, 1921:

ESCHWEILER, J. (*dissenting*). In this case I think the lower court should, during the trial, have granted the motion made to require the plaintiff trustee to disclose the names

of the bondholders whom the plaintiff as trustee merely was representing. I think also that this court should have granted such relief upon the motion made after hearing of this case.

The purpose of all the transactions with reference to this real estate was to secure a building upon the same which should be rented and become revenue producing. In order that it might be such it was essential that some one in lawful possession of the premises at the time should be able to enter into definite and certain leases with tenants and for reasonable terms. The consent of the trustee, not having taken possession, was entirely unnecessary, and the question whether or not he had so consented would only be material, if at all, upon the question of whether he was not thereby estopped from thereafter questioning any such lease. It stands uncontradicted in the record that the arrangement made with the *Arcade Theater Company* was a reasonable lease.

I think it became a binding obligation on all concerned and should not be regarded as in the nature of an incumbrance on the property, and that neither the mortgagor nor the trustee plaintiff should be heard to question the obligations of this lease, and it was as binding against the property as it was against the tenant.

A motion for a rehearing was denied, with $25 costs, on October 18, 1921.